**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.


SEIFULLAH CHAPMAN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS;
WARDEN JOHN OLIVER, in his official capacity;
FRANKIE CORDOVA, MD, individually and in his official capacity;
GEORGE SANTINI, MD, individually and in his official capacity;
ANTHONY OSAGIE, PA, individually and in his official capacity;
RONALD CAMACHO, PA, individually and in his official capacity;

      Defendants.

---

## COMPLAINT

---

    Plaintiff Seifullah Chapman hereby submits this Complaint for violation of his rights under the Eighth Amendment to the United States Constitution and Section 504 of the Rehabilitation Act of 1973.

### I.    Introduction

1. Mr. Chapman is currently incarcerated in solitary confinement at the U.S. Penitentiary - Administrative Maximum Security prison ("ADX") in Florence, Colorado. For his entire adult life, Mr. Chapman has suffered from an especially severe form of Type 1 diabetes. This serious medical need requires consistency in every aspect of Mr. Chapman's daily medical care. The lack of consistency in his medical care, from proper insulin administration to the

1

number of doctor's appointments he receives, has caused him harm and puts him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death. Defendants, however, provide consistently inconsistent medical care to Mr. Chapman and by doing so endanger his life on a daily basis.

## II.    Jurisdiction and Venue

2.   This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

3.   Venue is proper within this district pursuant to 28 U.S.C. § 1391 because all events giving rise to the claims occurred in this judicial district.

## III.    Parties

4.   Plaintiff Seifullah Chapman is a federal prisoner in the custody of the United States Bureau of Prisons who has been continuously confined in ADX since December 2010.

5.   Defendant Bureau of Prisons ("BOP") is an agency of the United States charged with the administration of federal prisons, including ADX. The BOP maintains physical custody of Mr. Chapman. The health care mission of the BOP is to provide appropriate and necessary medical services to prisoners by professional staff.

6.   Defendant John Oliver is the Warden of ADX, and, as such, is responsible for the care and custody of all prisoners housed in ADX. He oversees all BOP staff members at ADX, and he has final authority and responsibility for the promulgation, creation, and implementation of policies and procedures at ADX. Defendant Oliver is in charge of identifying BOP medical staff vacancies at ADX, recruiting BOP medical staff members at ADX, and filling BOP

medical staff vacancies at ADX. He approves or denies the first level of the grievance process for prisoners at ADX, including grievances related to medical care. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

7. Defendant Frankie Cordova, MD, is the Clinical Director at ADX, and, as such, is responsible for oversight of clinical care provided to prisoners housed at ADX, including oversight of routine and emergency medical care procedures. Defendant Cordova resides in the State of Colorado, is present at ADX on a regular basis, and has delivered medical services to Mr. Chapman. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

8. Defendant George Santini, MD is a physician employed at ADX, and as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for consulting with other BOP medical staff members at ADX, training and mentoring BOP medical staff members at ADX, and directly evaluating and treating prisoners who have severe illnesses and medically complex conditions at ADX. Defendant Santini resides in the State of Colorado, is present at ADX on a regular basis, and has delivered medical services to Mr. Chapman. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

9. Defendant Anthony Osagie, PA, is a Mid-Level Practitioner at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for answering requests for medical assistance, managing reoccurring conditions, and responding to medical emergencies. Defendant Osagie resides in the State of Colorado, is present at ADX on a regular basis, and has delivered medical services to Mr. Chapman. At

all times relevant to this Complaint, he was acting in the course and scope of his

employment.

10. Defendant Ronald Camacho, PA, is a Mid-Level Practitioner at ADX, and, as such, is

responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible

for answering requests for medical assistance, managing reoccurring conditions, and

responding to medical emergencies. Defendant Camacho resides in the State of Colorado, is

present at ADX on a regular basis, and has delivered medical services to Mr. Chapman. At

all times relevant to this Complaint, he was acting in the course and scope of his

employment.

### IV.   Statement of Facts

**A.  Defendants Unreasonably Delayed and Denied Mr. Chapman Adequate Medical Care and Continue to Do So.**

11. In 1994, Mr. Chapman was diagnosed with Type 1 diabetes, a serious medical need and

physical disability, that requires daily, specialized medical care.

12. Diabetes is a metabolic condition that makes it difficult for persons with diabetes to control

their blood sugar. Persons with Type 1 diabetes, in particular, struggle to control their blood

sugar. Mr. Chapman struggles even more than the typical person with Type 1 diabetes

because of his especially severe form of Type 1 diabetes and his hyperthyroidism.[1]

13. According to BOP policies and procedures and community standards of care, blood sugar

control is the goal of Mr. Chapman's diabetes management. This means that Mr. Chapman's

blood sugar should remain between 70 and 180 milligrams per deciliter ("mg/dl"). If his

---

[1] According to the Mayo Clinic, hyperthyroidism accelerates the body's metabolism and complicates an individual's ability to control his blood sugar. Hyperthyroidism can cause sudden weight loss, rapid or irregular heartbeat, sweating, nervousness, and irritability.

blood sugar is ever outside that range, he becomes hypoglycemic, that is, he has low blood

sugar, or he becomes hyperglycemic, that is, he has high blood sugar. When Mr. Chapman is

hypoglycemic or hyperglycemic, he is put at substantial risk of serious harm, including loss

of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma,

and imminent death.

14. Defendants' delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes

has prevented him from maintaining blood sugar control. As a result, he suffers from

worsening diabetic neuropathy (a severe form of nerve damage that can lead to decreased

blood flow, ulcers, chronic infections, and death); almost daily hypoglycemia (a life-

threatening condition); and frequent hyperglycemia (a painful condition).

**i.   Defendants Unreasonably Delayed and Denied Mr. Chapman the Ability to Manage His Type 1 Diabetes Through Proper Medication, Diet, and Exercise and Continue to Do So.**

15. According to BOP policies and procedures and community standards of care, Mr. Chapman

can only control his blood sugar through the three keys of diabetes management, namely,

proper medication, diet, and exercise.

16. Mr. Chapman relies on Defendants for proper medication, diet, and exercise.

17. Defendants have denied and continue to deny Mr. Chapman the ability to manage his

diabetes through medication, the first key to managing diabetes.

18. Mr. Chapman is substantially limited in his ability to care for himself, a major life activity,

because of his especially severe form of Type 1 diabetes.

19. According to BOP policies and procedures and the Americans Diabetes Association, Mr.

Chapman requires insulin to live because of his Type 1 diabetes.

20. BOP medical staff has prescribed a specific dosage of a specific form of insulin to administer to Mr. Chapman in the morning and at night.

21. On multiple occasions, BOP medical staff members, including Defendants Cordova, Osagie, and Camacho, have arrived at Mr. Chapman's cell with the wrong dosage of insulin.

22. On multiple occasions, BOP medical staff members, including Defendants Cordova, Osagie, and Camacho, have arrived at Mr. Chapman's cell with the wrong form of insulin.

23. Even when BOP medical staff members, including Defendants Osagie and Camacho, do arrive at Mr. Chapman's cell with the correct dosage and form of insulin, BOP medical staff members often improperly administer the insulin.

24. According to BOP policies and procedures, insulin should be drawn within 15 minutes of administering it because it can spoil and become ineffective if not administered promptly.

25. BOP medical staff members, including Defendants Osagie and Camacho, often draw insulin hours before administering it to Mr. Chapman such that by the time he receives it, it has solidified or otherwise become less effective.

26. According to BOP policies and procedures, insulin also should be drawn without any air in the syringe because otherwise Mr. Chapman will receive less than his prescribed dosage of insulin.

27. BOP medical staff, including Defendant Osagie, often allow air into the syringe when drawing insulin, and, as a result, administer the wrong dosage of insulin to Mr. Chapman.

28. In addition to BOP medical staff's arbitrary and improper insulin administration, BOP medical staff has arbitrarily and improperly changed Mr. Chapman's prescription for medical supplies. Mr. Chapman's medical supplies include lancets and test strips, which he needs to

6

check his blood sugar, and glucose gel tubes, which he needs to raise his blood sugar when he is hypoglycemic.

29. On multiple occasions, BOP medical staff members, including Defendants Cordova, Osagie, and Camacho, have depleted Mr. Chapman's already insufficient medical supplies by making him use the medical supplies prescribed for his own, personal use.

30. Furthermore, BOP medical staff members, including Defendants Osagie and Camacho, do not refill Mr. Chapman's prescribed medical supplies in a timely fashion, further limiting his ability to manage his blood sugar.

31. For a few months in 2014, BOP medical staff arbitrarily and improperly revoked Mr. Chapman's prescription for glucose gel tubes. Mr. Chapman's glucose gel tubes are a necessary tool for raising his blood sugar when he is hypoglycemic.

32. During recreation, glucose gel tubes are Mr. Chapman's only method for combating hypoglycemia because they are the only form of sugar he is permitted to take to the exercise cages.

33. When BOP staff members, including Defendant Osagie, arrive at Mr. Chapman's cell because he is having a medical emergency, they do not bring their own glucose gel tubes; instead, they use Mr. Chapman's limited, personal supply of glucose gel tubes to treat his hypoglycemia. This depletion of Mr. Chapman's limited, personal supply puts him at substantial risk of not being able to self-medicate when he is suffering hypoglycemia.

34. BOP medical staff also has arbitrarily and improperly reduced Mr. Chapman's ability to check his blood sugar.

35. According to BOP policies and procedures and community standards of care, Mr. Chapman needs to be able to check his blood sugar at critical times of day. At a minimum, these include when he wakes up, before he eats his meals, before and after he exercises, before he goes to sleep, and whenever he feels like his blood sugar is too high or too low.

36. At ADX, BOP medical staff initially provided Mr. Chapman with enough medical supplies to check his blood sugar five times a day: twice before receiving each insulin dose and three additional times. This meant that Mr. Chapman was not able to check his blood sugar at other critical times of day.

37. In May 2014, BOP medical staff arbitrarily and improperly reduced the number of times Mr. Chapman can check his blood sugar to three-and-a-half times a day. Now Mr. Chapman cannot check his blood sugar at most critical times of day.

38. BOP medical staff members, including Defendant Santini, assess the effectiveness of Mr. Chapman's medication and other aspects of his diabetes management during Chronic Care appointments.

39. These Chronic Care appointments are Mr. Chapman's main source of medical attention. Unlike prisoners in general population at less restrictive prisons, Mr. Chapman cannot access medical staff by walking into the prison clinic because he is in lockdown at ADX.

40. In the previous BOP institutions in which Mr. Chapman was incarcerated, the BOP provided Mr. Chapman with quarterly Chronic Care appointments. According to BOP policies and procedures, Mr. Chapman should receive at least quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes, his lack of blood sugar control, and his diabetic complications.

41. At ADX, the BOP provides Mr. Chapman with at most two Chronic Care appointments a year. During these appointments, BOP medical staff members, including Defendant Santini, do not actually evaluate Mr. Chapman's diabetes management. For example, when Mr. Chapman has described his problems with blood sugar control, Defendant Santini has done nothing to address them.

42. Defendants' delay and denial of Mr. Chapman's access to medication have excluded and continue to exclude him from BOP medical services because of his especially severe form of Type 1 diabetes.

43. Defendants' delay and denial of Mr. Chapman's access to medication have prevented him from utilizing the first key to managing diabetes, and have substantially harmed him or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

44. In addition, Defendants denied and continue to deny Mr. Chapman the ability to manage his diabetes through diet, the second key to managing diabetes.

45. Mr. Chapman is substantially limited in his ability to eat, a major life activity, because of his especially severe form of Type 1 diabetes.

46. Unlike most people – both in and out of prison – Mr. Chapman cannot eat a meal for company, tradition, or pleasure. On the contrary, food is medicine for Mr. Chapman. He must always adhere to a strict dietary regimen and meal time schedule because of his Type 1 diabetes.

47. According to BOP policies and procedure and community standards of care, Mr. Chapman should eat a consistent amount of carbohydrates each meal and have a means to identify the

amount of carbohydrates in each food item in his meals ("carbohydrate counting"). The

purpose of carbohydrate counting is to allow Mr. Chapman the ability to plan the proper

balance of medication, diet, and exercise.

48. Defendants have denied and continue to deny Mr. Chapman the ability to count his

carbohydrates.

49. According to BOP policies and procedures and community standards of care, Mr. Chapman

must eat in accordance with a set meal time schedule. According to community standards of

care, Mr. Chapman should receive his meals within 45 minutes of receiving his insulin.

50. BOP staff rarely delivers insulin within 45 minutes of Mr. Chapman's morning or evening

meal. Furthermore, BOP staff never delivers insulin with Mr. Chapman's lunch.

51. Defendants' denial of coordination between meals and insulin has caused Mr. Chapman to

have frequent hypo- and hyperglycemic episodes, causing him substantial harm and putting

him at substantial risk of serious harm in the future. According to BOP policies and

procedures, the "best" result of uncoordinated meals and insulin delivery is hyperglycemia

and the worst result is severe hypoglycemia.

52. The following graph plots the constant, life-threatening variation in Mr. Chapman's morning

and evening meal times (shaded lines) and insulin delivery times (fluctuating lines) from

January 2, 2013 to September 23, 2014. All of the data in the graph comes from Mr.

Chapman's BOP medical records.



53. Defendants' denial of coordination between meals and insulin substantially limits Mr. Chapman's ability to eat and has excluded and continues to exclude him from BOP food services because of his especially severe form of Type 1 diabetes.

54. Defendants' delay and denial of Mr. Chapman's access to food prevents him from utilizing the second key to managing diabetes. As a result, he has been substantially harmed and is at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

55. Furthermore, Defendants denied and continue to deny Mr. Chapman the ability to manage his diabetes through exercise, the third and final key to managing diabetes.

56. Mr. Chapman is substantially limited in his ability to exercise, a major life activity, because of his especially severe form of Type 1 diabetes.

57. According to BOP policies and procedures and community standards of care, Mr. Chapman must exercise in order to manage his Type 1 diabetes, but he can only do so when his exercise is coordinated with his meals and medication. If this coordination is lacking, exercise causes Mr. Chapman's blood sugar to plummet to a dangerously low level.

58. At ADX, Mr. Chapman is locked in a 70-square-feet-wide cell for an average of 22 to 24 hours a day.

59. BOP staff allows Mr. Chapman at most ten hours of out-of-cell exercise a week. Some weeks he has even less out-of-cell exercise because BOP staff arbitrarily cancels recreation time. For example, BOP staff canceled Mr. Chapman's recreation time for a week in 2014 because of Correctional Officers Appreciation Week.

60. Defendants' limitation or denial of Mr. Chapman's ability to exercise have excluded and continue to exclude him from BOP recreational services because of his especially severe form of Type 1 diabetes.

61. Defendants' limitation or denial of Mr. Chapman's ability to exercise have prevented him from utilizing the third key to managing diabetes; therefore, Defendants have denied and continue to deny Mr. Chapman the ability to manage his Type 1 diabetes. Defendants' delay and denial have substantially harmed Mr. Chapman and put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

ii.     **Defendants Unreasonably Delayed and Denied Mr. Chapman Access to Medical Care Because of Systematic and Gross Staffing Deficiencies and Continue to Do So.**

62. The systematic and gross deficiencies of BOP medical staff are part and parcel of Defendants' delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes.

63. Every day, Mr. Chapman depends on BOP medical staff to provide medical care for his especially severe form of Type 1 diabetes.

64. Every day, BOP medical staff must bring Mr. Chapman's morning and evening insulin.

65. The BOP medical staff members who are responsible for bringing Mr. Chapman insulin often fail to do so properly because they are new and inexperienced. Additionally, there is a high turnover rate of medical staff at the Florence Correctional Complex, including ADX.

66. Chronic understaffing of medical personnel negatively impacts the quality of prisoners' medical care, including Mr. Chapman's care.

67. According to BOP policies and procedures, Defendant Oliver is responsible for identifying medical staff vacancies at the Florence Correctional Complex, including ADX.

68. Defendant Oliver's understaffing of BOP medical personnel at the Florence Correctional Complex has led to delay and denial of medical care to Mr. Chapman.

69. According to BOP policies and procedures, additional medical staff must be provided during nights, early mornings, and weekends.

70. Often, there is only one medical staff member on-call at ADX. When there is only one on-call medical staff member, that person will perform a variety of tasks such as administering medication. While that sole medical staff member is performing these tasks, he is unavailable to respond if Mr. Chapman has a medical emergency.

71. In June 2014, Defendant Camacho told Mr. Chapman that his evening delivery of insulin occurred five hours late because Defendant Camacho was the only medical staff member currently at ADX, and that Defendant Camacho had to perform medical examinations on the new prisoners who had arrived earlier that day.

72. In August 2014, Defendant Camacho told Mr. Chapman that he would receive his insulin hours later than normal because all of the medical technicians had left BOP's employ.

### iii. Defendants' Delay and Denial of Adequate Medical Care Has Substantially Harmed Mr. Chapman and Put Him at Substantial Risk of Serious Harm.

73. Defendants' delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes has caused Mr. Chapman to suffer worsening diabetic neuropathy, almost-daily hypoglycemia, and frequent hyperglycemia.

74. According to BOP policies and procedures and the American Diabetes Association, diabetic neuropathy is a severe form of nerve damage that worsens when the blood sugar of a person with diabetes is out of control.

75. Mr. Chapman's diabetic neuropathy has worsened because Defendants have denied him the ability to control his blood sugar. This worsening has caused Mr. Chapman to suffer tremors in his extremities and considerable pain. This worsening also has put Mr. Chapman at substantial risk of decreased blood flow, ulcers, chronic infections, and death.

76. Defendants' delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes put him at substantial risk of loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

77. Additionally, Defendants' prevention of Mr. Chapman from controlling his blood sugar causes him to suffer almost daily hypoglycemia and frequent hyperglycemia.

14

78. The following graph plots the 238 times from February 14, 2011 to March 15, 2014, that Mr. Chapman's life was in danger because of hypoglycemia. All of the data in the graph comes from Mr. Chapman's BOP medical records. Mr. Chapman, however, often experiences hypoglycemic episodes when he is alone in his cell, and which are therefore not recorded in his BOP records.



79. As of February 1, 2015, Mr. Chapman suffers hypoglycemia at least every fifth blood sugar check.

80. When Mr. Chapman is hypoglycemic he sweats profusely.

81. When Mr. Chapman is hypoglycemic he feels weak.

82. When Mr. Chapman is hypoglycemic his limbs are hard to move.

83. When Mr. Chapman is hypoglycemic he feels like his chest is going to explode.

84. When Mr. Chapman is hypoglycemic he has a gag reflex even when drinking water.

85. When Mr. Chapman is hypoglycemic he gets severe headaches.

86. When Mr. Chapman is hypoglycemic he feels foggy and has difficulty reading.

87. When Mr. Chapman is hypoglycemic he begins to shake.

88. When Mr. Chapman is hypoglycemic he can suffer neuroglycopenia, a medical condition in which a person suffering hypoglycemia experiences an altered mental state because of the lack of blood sugar in the brain. At ADX, Mr. Chapman has suffered neuroglycopenia over a hundred times.

89. When Mr. Chapman is hypoglycemic he can lose consciousness and be completely unaware for hours at a time. At ADX, Mr. Chapman has lost consciousness approximately a dozen times.

90. The frequency with which Mr. Chapman suffers hypoglycemia makes him less and less likely to be able to perceive when he is hypoglycemic, and, therefore, more and more dependent on BOP medical staff responding to his requests for medical assistance.

91. When Mr. Chapman pushes the emergency call button in his cell for a medical emergency, BOP correctional staff responds first. BOP policies and procedures mandate that correctional staff should call a BOP physician when a person with diabetes is suffering hypoglycemia.

92. Despite Mr. Chapman's reliance on BOP staff to call a physician when he is hypoglycemic, BOP correctional staff rarely does so.

93. Furthermore, Mr. Chapman is additionally reliant on BOP medical staff because he is at high risk for suffering hypoglycemia while sleeping.

94. As a result of this high risk of hypoglycemia, Mr. Chapman is substantially limited in his ability to sleep, a major life activity, because of his especially severe form of Type 1 diabetes.

95. In addition to hypoglycemia, Defendants' delay and denial of adequate medical care has caused Mr. Chapman to frequently suffer hyperglycemia, a very painful medical condition that can lead to a life-threatening medical condition called diabetic ketoacidosis.

96. The following graph plots the 546 times from January 19, 2011 to March 10, 2014, that Mr. Chapman suffered harm and pain, and that he was put at risk of suffering further harm and pain, because of hyperglycemia. All of the data in the graph come from Mr. Chapman's BOP medical records. Mr. Chapman, however, often experiences hyperglycemic episodes when he is alone in his cell, and which are therefore not recorded in his BOP records.



97. As of February 1, 2015, Mr. Chapman suffers hyperglycemia multiple times a week.

98. When Mr. Chapman is hyperglycemic he feels severe body pain.

99. When Mr. Chapman is hyperglycemic he feels chest pain.

100.    When Mr. Chapman is hyperglycemic he feels weak.

101.    When Mr. Chapman is hyperglycemic he becomes dehydrated from frequent urination (often every fifteen minutes).

102.    When Mr. Chapman is hyperglycemic he feels like his blood is on fire.

103.    When Mr. Chapman is suffering hyperglycemia, hypoglycemia, or another kind of medical emergency, he presses the emergency call button in his cell in order to summon BOP staff to his cell.

104.    Often, BOP staff does not respond after Mr. Chapman has pressed his emergency call button.

105.    When BOP staff members do respond, they do so after more than 45 minutes have elapsed. On more than one occasion, BOP staff has taken eight hours to respond. For example, in 2013, Mr. Chapman nearly lost consciousness from hypoglycemia after no BOP staff member ever responded when he pressed his emergency call button.

106.    When BOP staff members do respond and come to Mr. Chapman's cell, they will determine if it is necessary to summon a BOP medical staff member. Even when correctional staff members attempt to summon a BOP medical staff member, they are often unsuccessful in doing so. For example, on multiple occasions, BOP staff called Defendant Osagie to Mr. Chapman's cell because of Mr. Chapman's dangerous medical condition, and Defendant Osagie never came.

107.    If BOP medical staff members do arrive, they come empty-handed. For example, when Mr. Chapman is hypoglycemic, BOP medical staff members rely on and use Mr. Chapman's

limited, personal supply of glucose gel tubes and food he bought at the commissary to increase his blood sugar.

108.    In addition to the problems Mr. Chapman faces when he is able to press his emergency call button, Mr. Chapman often faces problems actually pressing the button.

109.    When Mr. Chapman is hyperglycemic, he often cannot press his emergency call button because he is in such extreme pain that he cannot control his extremities in order to press his button.

110.    When Mr. Chapman is hypoglycemic, his mental state can be so altered that he cannot realize that he should press his emergency call button. Moreover, because Mr. Chapman is in solitary confinement and BOP staff members rarely walk by his cell, Mr. Chapman must hope that prisoners in nearby cells will hear his manifestations of his altered mental state (such as spontaneous singing) or him fall and hit his concrete furniture or the concrete floor, and then press their emergency call buttons for him.

111.    Defendants' delay and denial of medical care for Mr. Chapman's serious medical need has caused and continues to cause him substantial harm and pain, and put him at substantial risk of serious harm.

   **B. Defendants Knew that Their Inadequate Medical Care for Mr. Chapman Harmed Him and Put Him at Substantial Risk of Serious Harm, and They Recklessly Disregarded that Risk.**

112.    Since Mr. Chapman's arrival at ADX, Defendants have known that Mr. Chapman has an especially severe form of Type 1 diabetes that requires daily, specialized medical care.

113.    The BOP has classified Mr. Chapman as a prisoner who requires more medical attention than the typical prisoner.

114.   Before Mr. Chapman was sent to ADX, the BOP incarcerated him in the United States

Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"), the BOP's

medical prison. Mr. Chapman's health was in grave danger after BOP medical staff at the

United States Penitentiary in Lewisburg, Pennsylvania, removed him from insulin entirely.

The BOP kept Mr. Chapman in Springfield for over a year in order to stabilize his diabetes

management.

115.   During a 2011 Chronic Care appointment, a BOP physician wrote that "[Mr. Chapman]

might prove to be a very brittle diabetic challenge . . . . We will have to monitor [him] very

closely to prevent transfer back to [Springfield]."

116.   BOP policies and procedures and community standards of care state that blood sugar

control is the goal of diabetes management. Since Mr. Chapman's arrival, Defendants knew

that denying him blood sugar control has caused him harm or put him at substantial risk of

serious harm. Alternatively, Defendants should have known that their denial of blood sugar

control has caused him harm or put him at substantial risk of serious harm because the risk of

uncontrolled blood sugar was obvious.

### i.   Defendants Knew that Denying Mr. Chapman Access to Proper Medication, Diet, and Exercise Harmed Him and Put Him at Substantial Risk of Serious Harm, and They Recklessly Disregarded that Risk.

117.   Defendants' own policies and procedures, consistent with community standards of care,

state that persons with diabetes can only control their blood sugar through proper medication,

diet, and exercise.

118.   Defendants either knew that they were harming Mr. Chapman by failing to provide him

with proper medication, the first key to diabetes management, or Defendants should have

known because the substantial risk of serious harm to Mr. Chapman resulting from improper medication was obvious.

119.    According to Defendants' own policies and procedures, consistent with community standards of care, persons with Type 1 diabetes need insulin to live.

120.    Defendants knew that BOP medical staff prescribed Mr. Chapman a specific dosage of a specific form of insulin to administer to him in the morning and at night.

121.    On multiple occasions, Mr. Chapman has told BOP medical staff members, including Defendants Cordova, Osagie, and Camacho, that they are administering the wrong dosage or form of insulin.

122.    Defendants, as medical staff, either knew that administering insulin diluted with air causes Mr. Chapman harm by reducing the dosage of insulin he receives, or Defendants should have known because the substantial risk of serious harm to Mr. Chapman from receiving improper doses of insulin was obvious.

123.    On multiple occasions, Mr. Chapman has told BOP staff members, including Defendant Osagie, that they were administering insulin diluted with air.

124.    Defendants' own policies and procedures mandate that insulin should be administered within 15 minutes of drawing it because it can spoil and become ineffective if not administered promptly.

125.    In 2014, the BOP denied Mr. Chapman's Administrative Remedy #784108, in which he requested that BOP medical staff draw insulin into the syringe within 15 minutes of administering it. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

126.    In 2012 and 2013, Mr. Chapman's counsel sent letters to the former warden of ADX, David Berkebile, and requested that BOP medical staff draw insulin into the syringe within 15 minutes of administering it, and informed Warden Berkebile that BOP medical staff never does this. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that insulin should be administered within 15 minutes of drawing it into the syringe. In 2014, when Defendant Oliver became warden of ADX, Mr. Chapman's counsel forwarded the letters to Defendant Oliver in order to apprise him of all of this information (the "2014 Warden Letter"). Defendant Oliver did not respond to the 2014 Warden Letter, nor did Defendant Oliver or any one else address any of Mr. Chapman's requests in the letter.

127.    On multiple occasions, Mr. Chapman has told BOP medical staff members that they are not administering insulin within a 15 minute window.

128.    Community standards of care mandate that Mr. Chapman have the proper medical supplies with which to manage his Type 1 diabetes. Defendants either knew that their failure to provide Mr. Chapman with the proper medical supplies harmed him, or they should have known because the substantial risk of serious harm to Mr. Chapman from not having the proper medical supplies was obvious.

129.    Defendants' own policies and procedures mandate that prisoners receive their prescribed medical supplies in a timely fashion.

130.    On multiple occasions, Mr. Chapman has asked Defendants Osagie and Camacho to replenish his prescribed medical supplies in a timely fashion, to no avail.

131.    On multiple occasions, Mr. Chapman has asked Defendant Camacho to replenish his
prescribed medical supplies, and Defendant Camacho has refused because, in Defendant
Camacho's opinion, it is not his "job" as a Mid-Level Practitioner to do so.

132.    Defendants knew that Mr. Chapman was prescribed a limited supply of glucose gel tubes
each month.

133.    Defendants knew that the only form of sugar that they permitted Mr. Chapman to bring
with him during recreation is his glucose gel tubes.

134.    Defendants' own policies and procedures mandate that persons with diabetes be able to
check their blood sugar as needed.

135.    Community standards of care mandate that persons with diabetes be able to check their
blood sugar at least six times a day. Defendants either knew that they harmed Mr. Chapman
by denying him the ability to check his blood sugar frequently enough, or Defendants should
have known because the substantial risk of serious harm to Mr. Chapman from being unable
to adequately check his blood sugar was obvious.

136.    Defendants knew that BOP staff members use and deplete Mr. Chapman's prescribed
medical supplies and therefore interfere with his ability to self-medicate when he is
hypoglycemic.

137.    Defendants knew that BOP medical staff changed Mr. Chapman's prescription from
being able to check his blood sugar five times a day to being able to check his blood sugar
three-and-a-half times a day.

138.    In 2014, the BOP denied Mr. Chapman's Administrative Remedy #784105, in which he
requested to be able to check his blood sugar six times a day. Defendant Oliver, who

approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

139.   In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP medical staff allow Mr. Chapman to check his blood sugar six times a day, pursuant to community standards of care that mandate that Mr. Chapman be allowed to check his blood sugar at least six times a day.

140.   In 2014, Mr. Chapman wrote letters to Defendant Osagie, Defendant Camacho, and the BOP pharmacy, in which he requested that he be allowed to check his blood sugar more frequently.

141.   Defendants' own policies and procedures recommend that Mr. Chapman receive at least quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes, his lack of blood sugar control, and his diabetic complications. Defendants either knew that providing Mr. Chapman with insufficient Chronic Care appointments caused him harm, or they should have known because the substantial risk of serious harm to Mr. Chapman from not having frequent Chronic Care appointments was obvious.

142.   In 2014, the BOP denied Mr. Chapman's Administrative Remedy #782449, in which he requested quarterly Chronic Care appointments. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

143.   In the 2014 Warden Letter, Mr. Chapman's counsel requested that Defendant Oliver provide Mr. Chapman with quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that Mr. Chapman receive quarterly Chronic Care appointments.

144. Defendants either knew that they harmed Mr. Chapman by failing to provide him with the proper diet, or they should have known because the substantial risk of serious harm to Mr. Chapman from having an improper diet was obvious.

145. Defendants' own policies and procedures, consistent with community standards of care, recommend that persons with diabetes be allowed to count carbohydrates every meal.

146. In 2012, the BOP denied Mr. Chapman's Administrative Remedy #629975, in which he requested to be allowed to count his carbohydrates. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

147. In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP staff provide Mr. Chapman with consistent amount of carbohydrates. Mr. Chapman's counsel stated that community standards of care recommend that a person with diabetes be provided a consistent amount of carbohydrates.

148. Defendants' own policies and procedures, consistent with community standards of care, mandate that a prisoner with diabetes receive his meals at consistent times that coordinate with insulin delivery times.

149. According to community standards of care, persons with diabetes should receive their meals within 45 minutes of receiving insulin.

150. Defendants' own policies and procedures state that the "best" result of uncoordinated meals and insulin delivery is hyperglycemia and the worst result is severe hypoglycemia.

151. In 2014, the BOP denied Mr. Chapman's Administrative Remedy #781510, in which he requested that BOP staff deliver his insulin at consistent times and within 45 minutes of his

meals. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

152.     In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP staff provide Mr. Chapman with meals at consistent times. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that a person with diabetes consume meals and insulin within a 45 minute window.

153.     Defendants either knew that they harmed Mr. Chapman by failing to provide him with the proper amount of exercise, the third key for diabetes management, or they should have known because the substantial risk of serious harm to Mr. Chapman from inadequate exercise was obvious.

154.     Defendants' own policies and procedures, consistent with community standards of care, state that persons with diabetes exercise the proper amount in order to manage their diabetes.

155.     Defendants either knew that they harmed Mr. Chapman by providing him with at most ten hours of out-of-cell exercise a week, or they should have known because the substantial risk of serious harm to Mr. Chapman from inadequate exercise was obvious.

156.     In 2011, the BOP denied Mr. Chapman's Administrative Remedy #630355, in which he requested BOP staff allow him to exercise more in order to manage his Type 1 diabetes. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

157.     In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant Oliver of the importance of exercise for the management of Mr. Chapman's Type 1 diabetes.

  ii. **Defendant Oliver Knew that Systemic and Gross Staffing Deficiencies Harmed Mr. Chapman and Put Him at Serious Risk of Substantial Harm, and He Disregarded that Risk.**

158. Defendants' own policies and procedures state that the warden of a BOP prison is in charge of identifying the BOP medical staff vacancies at the prison of which he is warden.

159. Defendants' own policies and procedures state that the understaffing of medical staff negatively impacts the quality of prisoners' medical care.

160. Defendants' own policies and procedures mandate that additional medical staff members be provided during nights, early mornings, and weekends.

161. In 2014, the BOP denied Mr. Chapman's Administrative Remedy #785175, in which he requested that the BOP employ additional medical staff for insulin administration. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

162. In the 2014 Warden Letter, Mr. Chapman's counsel requested that the BOP employ additional medical staff to prevent unnecessary delays during insulin administration, and that the BOP properly train all medical staff members.

163. Since Mr. Chapman's arrival, the BOP and Defendant Oliver either knew that they harmed Mr. Chapman through the systematic and gross staffing deficiencies at ADX, or they should have known because the substantial risk of serious harm to Mr. Chapman from these deficiencies and the corresponding inadequate medical care was obvious. Despite the BOP's and Defendant Oliver's knowledge of this, they have recklessly disregarded the substantial risk of serious harm to Mr. Chapman and acted unreasonably.

### iii.    Defendants Knew that Mr. Chapman Suffered Severe Symptoms of Diabetes and that He Was at Substantial Risk of Serious Harm of Such Symptoms.

164.    Defendants' own policies and procedures, consistent with the Americans with Diabetes Association's position, state that diabetic neuropathy is treated by blood sugar control.

165.    In a 2011 clinical encounter with Mr. Chapman, a BOP physician wrote in Mr. Chapman's medical record that Mr. Chapman developed a form of diabetic neuropathy as a complication of his Type 1 diabetes.

166.    Defendants knew that Mr. Chapman has suffered hypoglycemia and remains at substantial risk of suffering hypoglycemia.

167.    Defendants' own policies and procedures mandate that a BOP physician be called when a person with diabetes is suffering hypoglycemia.

168.    Since Mr. Chapman's arrival, Defendants documented 238 times from February 14, 2011, to March 15, 2015, during which Mr. Chapman suffered hypoglycemia.

169.    In a 2011 Chronic Care appointment with Mr. Chapman, a BOP physician wrote in Mr. Chapman's medical record that "[Mr. Chapman] reports severe hypoglycemic levels to 'to 0' in the past."

170.    In a 2013 Clinical Encounter with Mr. Chapman, Defendant Osagie wrote in Mr. Chapman's medical record that "[Mr. Chapman is] a known diabetic who periodically experiences severe hypoglycemic episode[s]."

171.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant Oliver that Mr. Chapman is at an increased risk of suffering hypoglycemia because of his especially severe form of Type 1 diabetes.

172.    In 2014, Mr. Chapman sent Defendant Osagie a letter from Mohammed Shakir, M.D., an endocrinologist who treated Mr. Chapman before his incarceration (the "2014 Dr. Shakir Letter"). In the letter, Dr. Shakir warned that Mr. Chapman is at high risk of hypoglycemia and that Mr. Chapman may suffer hypoglycemia while sleeping.

173.    In 2014, Mr. Chapman informed Defendant Santini that he shakes and suffers frequent defecation (itself an indication of low blood sugar). Defendant Santini did not do anything to address Mr. Chapman's symptoms, which are ongoing.

174.    Defendants knew that Mr. Chapman has suffered hyperglycemia and remains at substantial risk of suffering hyperglycemia.

175.    Defendants documented 546 times from January 19, 2011, to March 10, 2014, during which Mr. Chapman suffered hyperglycemia.

176.    In the 2014 Shakir Letter, Dr. Shakir warned Defendant Osagie that Mr. Chapman is at high risk of suffering hyperglycemia.

177.    On multiple occasions, Defendant Camacho told Mr. Chapman that Defendant Camacho will not come to Mr. Chapman's assistance when he is hyperglycemic because, in Defendant Camacho's opinion, Mr. Chapman will not die immediately from hyperglycemia.

178.    Defendants either knew that Mr. Chapman is at substantial risk of developing diabetic ketoacidosis when his hyperglycemia is left untreated, or Defendants should have known because that risk was obvious.

179.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant Oliver that failure to treat hyperglycemia can cause diabetic ketoacidosis.

180.   In the 2014 Shakir Letter, Dr. Shakir warned Defendant Osagie that Mr. Chapman is at

high risk of diabetic ketoacidosis.

181.   Defendants either knew that they have caused Mr. Chapman to suffer and put him at

substantial risk of worsening diabetic neuropathy, almost daily hypoglycemia, and frequent

hyperglycemia, or they should have known because these risks to Mr. Chapman were

obvious. Despite this knowledge, Defendants have recklessly disregarded the substantial risk

of serious harm to Mr. Chapman and acted unreasonably.

182.   Defendants have acted with deliberate indifference to Mr. Chapman's serious medical

need.

## V.   Claims for Relief

## FIRST CLAIM FOR RELIEF

## (Eighth Amendment Violation – Inadequate Medical Care)

## (Against All Defendants)

183.   Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set herein.

184.   At all times relevant to the allegations in this Complaint, Defendants acted or failed to act

under color of federal law.

185.   At all times relevant to the allegations in this Complaint, Defendants were acting

pursuant to federal custom, policy, or practice in their acts and omissions pertaining to Mr.

Chapman's inadequate medical care for his Type 1 diabetes.

186.   The Eighth Amendment to the United States Constitution forbids cruel and unusual

punishments.

187.    Under the Eighth Amendment, prison officials must provide adequate medical care to

prisoners, who rely entirely on the prison system for their medical needs.

188.    Mr. Chapman, while housed at ADX, was and is constitutionally entitled to receive

adequate medical care for his serious medical need, Type 1 diabetes. The right to receive

adequate medical care is a clearly established right, and at no time during Mr. Chapman's

housing at ADX would a reasonable prison official have thought it lawful to deny Mr.

Chapman his constitutional right to adequate medical care.

189.    Acting with deliberate indifference to Mr. Chapman's constitutional right to receive

adequate medical care, Defendants delayed and denied and continue to delay and deny Mr.

Chapman medical care in accordance with the community standards of care and BOP

policies and procedures for treating Type 1 diabetes.

190.    Defendants' delay and denial of inadequate medical care to Mr. Chapman caused and

continue to cause him to suffer substantial harm that serves no penological purpose, namely,

considerable pain and suffering, hyperglycemia, hypoglycemia, worsening neuropathy, and

loss of consciousness.

191.    Defendants' delay and denial of inadequate medical care to Mr. Chapman caused and

continue to cause him to be subject to substantial risk of serious harm, namely, considerable

pain and suffering, hyperglycemia, hypoglycemia, consciousness, diabetic ketoacidosis,

kidney failure, blindness, stroke, heart failure, coma, and imminent death.

192.    Defendants knew or should have known that their inadequate medical care caused Mr.

Chapman to be subject to substantial harm and substantial risk of serious harm.

193.    Defendant Oliver, as warden of ADX, promulgated, created, implemented or possessed responsibility for the policies and procedures concerning Mr. Chapman's medical care that caused Mr. Chapman substantial harm and substantial risk of serious harm. Defendant Oliver acted with a mindset of deliberate indifference because he knew or should have known that the policies and procedures at ADX caused Mr. Chapman to be subject to substantial harm and substantial risk of serious harm.

194.    Defendants' acts and omissions are the proximate cause of Mr. Chapman's deprivation of rights under the Eighth Amendment.

195.    The acts or omissions of Defendants were conducted within the scope of their official duties and employment.

## SECOND CLAIM FOR RELIEF

### (Sec. 504 Rehabilitation Act – Disability Discrimination)

### (Against all Defendants)

196.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set herein.

197.    ADX is a federal administrative maximum security penitentiary that receives and benefits from federal financial assistance as the term "federal financial assistance" is used in 29 U.S.C. § 794.

198.    Mr. Chapman is an individual with a physical disability within the meaning of 42 U.S.C. § 12102 (as incorporated into 29 U.S.C. § 705(9)(B)) because his diabetes constitutes a physical impairment that substantially limits him in several major life activities, including, but not limited to, exercising, eating, sleeping, and caring for himself. These limitations on his life activities have had a profound effect on Mr. Chapman's life as described above. Mr.

Chapman also has a record of an impairment that substantially limits the above-listed major life activities, and he also is regarded as having such an impairment.

199.  As a prisoner in the custody of the BOP, Mr. Chapman is qualified for the programs, activities, aids, benefits, and services offered by the BOP.

200.  Mr. Chapman - with or without reasonable modifications to rules, policies, or practices - met and continues to meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants. Thus, Mr. Chapman is a "qualified handicapped person" within the meaning of the 29 U.S.C. § 794.

201.  Defendants have discriminated against Mr. Chapman on the basis of his disability in violation of 29 U.S.C. § 794 and its implementation of BOP policies and procedures.

202.  Such discrimination includes, but is not limited to, the exclusion of Mr. Chapman on the basis of his disability from services and programs afforded to prisoners. These programs and services include, but are not limited to, medical services, food services, and recreational services. Defendants have also failed to make reasonable accommodations and modifications, to policies, practices, and procedures that are necessary for Mr. Chapman to be able to participate in Defendants' services, programs and activities, including but not limited to medical services, food services, and recreation.

203.  Defendants' discrimination is intentional and represents deliberate indifference to the strong likelihood that pursuit of the actions and policies at issue in this Complaint would likely result in a violation of federally protected rights.

## VI.     Prayer for Relief

Plaintiff requests that this Court enter judgment for him and against each of the

Defendants, and award Plaintiff all relief allowed by law, including but not limited to the

following:

204.    an injunction be entered against all Defendants in their official capacities requiring

medical care for Mr. Chapman's Type 1 diabetes be provided in accordance with community

standards of care;

205.    a declaration that Mr. Chapman has been deprived by Defendants of his right to be free

from cruel and unusual punishment in violation of the Eighth Amendment to the

Constitution;

206.    a declaration that Defendants have discriminated against Mr. Chapman on the basis of his

Type 1 diabetes in violation of Section 504 of the Rehabilitation Act;

207.    compensatory damages against Defendants Cordova, Santini, Osagie, and Camacho in

their individual capacities in an amount to be determined at trial;

208.    punitive damages on all claims allowed by law and in an amount to be determined at trial;

209.    nominal damages on all claims allowed by law and in an amount to be determined at trial;

210.    attorneys' fees and costs associated with this action, including expert witness fees, on all

claims allowed by law;

211.    any further relief that this Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Dated: February 9, 2015

Respectfully submitted,

STUDENT LAW OFFICE

/s/ Laura Rovner
Laura Rovner
Lauren Fontana
University of Denver Sturm College of Law
2255 E. Evans Ave., Ste. 335
Denver, CO 80208
Phone: (303) 871-6140
Email: lrovner@law.du.edu