**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-000279-WYD-KLM

SEIFULLAH CHAPMAN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS;
WARDEN JOHN OLIVER, in his official capacity;
FRANKIE CORDOVA, MD, individually and in his official capacity;
GEORGE SANTINI, MD, individually and in his official capacity;
ANTHONY OSAGIE, PA, individually and in his official capacity;
RONALD CAMACHO, PA, individually and in his official capacity;

      Defendants.

---

**AMENDED COMPLAINT**

---

Plaintiff Seifullah Chapman hereby submits this Complaint for violation of his rights under the Eighth Amendment to the United States Constitution and Section 504 of the Rehabilitation Act of 1973.

## I.     Introduction

1. Mr. Chapman is currently incarcerated in solitary confinement at the U.S. Penitentiary - Administrative Maximum Security prison ("ADX") in Florence, Colorado. For his entire adult life, Mr. Chapman has suffered from an especially severe form of Type 1 diabetes. This serious medical need requires consistency in every aspect of Mr. Chapman's daily medical care. If this consistency is lacking in any aspect of Mr. Chapman's medical care, from proper insulin administration to the

1

number of doctor's appointments he receives, he is substantially harmed or put at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.  Defendants, however, provide consistently inconsistent medical care to Mr. Chapman and by doing so endanger his life on a daily basis.

## II.    Jurisdiction and Venue

2.   This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

3.   Venue is proper within this district pursuant to 28 U.S.C. § 1391 because all events giving rise to the claims occurred in this judicial district.

## III.    Parties

4.   Plaintiff Seifullah Chapman is a federal prisoner in the custody of the United States Bureau of Prisons who has been continuously confined in ADX since December 2010.

5.   Defendant Bureau of Prisons ("BOP") is a federal law enforcement agency subdivision of the United States Department of Justice, and, as such, is responsible for the administration of federal prisons, including ADX. The BOP maintains physical custody of Mr. Chapman. The health care mission of the BOP is to provide appropriate and necessary medical services to prisoners by professional staff.

6.   Defendant John Oliver is the Warden of ADX, and, as such, is responsible for the care and custody of all prisoners housed in ADX. He oversees all BOP staff members at ADX, and he has final authority and responsibility for the promulgation, creation, and implementation of policies and procedures at ADX. He is in charge of identifying

BOP medical staff vacancies at ADX, recruiting BOP medical staff members at ADX, and filling BOP medical staff vacancies at ADX. He approves or denies the first level of the grievance process for prisoners at ADX, including grievances related to medical care. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

7.  Defendant Frankie Cordova, MD, is the Assistant Health Services Administrator at ADX, and, as such, is responsible for the ADX medical care department's administrative operations and for the supervision of Mid-Level Practitioners, Emergency Medical Technicians, and nurses. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

8.  Defendant George Santini, MD, is a physician employed at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for consulting with other BOP medical staff members at ADX, training and mentoring BOP medical staff members at ADX, and directly evaluating and treating prisoners who have severe illnesses and medically complex conditions at ADX. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

9.  Defendant Anthony Osagie, PA, is a Mid-Level Practitioner at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for answering requests for medical assistance, managing reoccurring conditions, and responding to medical emergencies. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

10. Defendant Ronald Camacho, PA, is a Mid-Level Practitioner at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for answering requests for medical assistance, managing reoccurring conditions, and responding to medical emergencies. At all times relevant to this Complaint, he was acting in the course and scope of his employment.

### IV.    Statement of Facts

**A.  Defendants Unreasonably Delayed and Denied and Continue to Unreasonably Delay and Deny Mr. Chapman Adequate Medical Care for His Serious Medical Need, Type 1 Diabetes.**

11. In 1994, Mr. Chapman was diagnosed with Type 1 diabetes, a serious medical need and physical disability that requires daily, specialized medical care.

12. Diabetes is a metabolic condition that makes it difficult for persons with diabetes to control their blood sugar. Persons with Type 1 diabetes, in particular, struggle to control their blood sugar. Mr. Chapman struggles even more than the typical person with Type 1 diabetes because of his especially severe form of Type 1 diabetes and his hyperthyroidism.[1]

13. According to BOP policies and procedures and community standards of care, blood sugar control is the goal of Mr. Chapman's diabetes management. This means that Mr. Chapman's blood sugar should remain between 70 and 180 milligrams per deciliter ("mg/dl"). If his blood sugar is ever outside that range, he becomes hypoglycemic, that is, he has low blood sugar, or he becomes hyperglycemic, that is, he has high blood sugar. When Mr. Chapman is hypoglycemic or hyperglycemic he is put at substantial risk of serious future harm, including loss of consciousness, diabetic

---

[1] According to the Mayo Clinic, hyperthyroidism accelerates the body's metabolism and complicates an individual's ability to control his blood sugar. Hyperthyroidism can cause sudden weight loss, rapid or irregular heartbeat, sweating, nervousness, and irritability.

ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

14. The delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes caused by Defendants Osagie, Camacho, Santini, and Cordova have prevented Mr. Chapman from blood sugar control, and, as a result, he suffers from worsening diabetic neuropathy (a severe form of nerve damage that can lead to decreased blood flow, ulcers, chronic infections, and death), almost daily hypoglycemia (a life-threatening condition), and frequent hyperglycemia (a painful condition).

**i.  Defendants Unreasonably Delayed and Denied and Continue to Unreasonably Delay and Deny Mr. Chapman the Ability to Manage His Type 1 Diabetes Through Proper Medication, Diet, and Exercise.**

15. According to BOP policies and procedures and community standards of care, Mr. Chapman can only control his blood sugar through the three keys of diabetes management, namely, proper medication, diet, and exercise.

16. Mr. Chapman relies on Defendants for proper medication, diet, and exercise.

17. Defendants Osagie, Camacho, Santini, Cordova, and Oliver denied and continue to deny Mr. Chapman the ability to manage his diabetes through medication, the first key to managing diabetes.

18. Mr. Chapman is substantially limited in his ability to care for himself, a major life activity, because of his especially severe form of Type 1 diabetes.

19. According to BOP policies and procedures and the Americans Diabetes Association (the "ADA"), Mr. Chapman requires insulin to live because of his Type 1 diabetes.

20. BOP medical staff has prescribed a specific dosage of a specific form of insulin to administer to Mr. Chapman in the morning and at night.

21. In March 2011, BOP medical staff, including Defendant Osagie, arbitrarily changed Mr. Chapman's insulin prescription and this change caused Mr. Chapman's health to deteriorate so much that he was hospitalized in the ADX infirmary. BOP medical staff, including Defendant Osagie, did not change back Mr. Chapman's insulin prescription for 18 months during which time Mr. Chapman's blood sugar levels fluctuated dramatically. In this 18-month period of time Mr. Chapman discussed with Defendant Osagie his need to return to his previous insulin prescription because of his out of control blood sugar, but Defendant Osagie did not reinstate Mr. Chapman's previous insulin prescription.

22. On multiple occasions, BOP medical staff members, including Defendants Osagie, and Camacho, have arrived at Mr. Chapman's cell with the wrong dosage of insulin.

23. On multiple occasions, BOP medical staff members, including Defendants ~~Cordova,~~ Osagie, and Camacho, have arrived at Mr. Chapman's cell with the wrong form of insulin.

24. Even when BOP medical staff members, including Defendants Osagie and Camacho, do arrive at Mr. Chapman's cell with the correct dosage and form of insulin, BOP medical staff members, including Defendants Osagie and Camacho, often improperly administer the insulin.

25. According to BOP policies and procedures, insulin should be drawn within 15 minutes of administering it because it can spoil and become ineffective if not administered promptly.

26. BOP medical staff members, including Defendants Osagie and Camacho, often draw insulin hours before administering it to Mr. Chapman such that by the time he receives it, it has solidified or otherwise become less effective.

27. According to BOP policies and procedures, insulin also should be drawn without any air in the syringe because otherwise Mr. Chapman will receive less than his prescribed dosage of insulin.

28. BOP medical staff, including Defendant Osagie, will often allow air into the syringe when drawing insulin, and, as a result, administer the wrong dosage of insulin to Mr. Chapman.

29. In addition to BOP medical staff's (including Defendants Osagie and Camacho) arbitrary and improper insulin administration, BOP medical staff has arbitrarily and improperly changed Mr. Chapman's prescription for medical supplies. Mr. Chapman's medical supplies include a personal glucometer, lancets, and test strips, which he needs to check his blood sugar, and glucose gel tubes, which he needs to raise his blood sugar when he is hypoglycemic.

30. According to community standards of care a person with diabetes needs to have the battery changed in his glucometer or have his glucometer replaced every two years because the glucometer becomes less accurate as the battery dies. Most glucometers do not show the user that the battery is dying.

31. Mr. Chapman received a new personal glucometer in May 2013. Since then, BOP staff, including Defendants Osagie and Santini, has not provided Mr. Chapman with new batteries for his glucometer and thus the glucometer is likely inaccurate.

32. On multiple occasions, BOP medical staff members, including Defendants Cordova, Osagie, and Camacho, have depleted Mr. Chapman's already insufficient medical supplies by making him use the own medical supplies prescribed for his own, personal use. BOP medical staff members, including Defendants Cordova, Osagie, and Camacho, are responsible for using their own medical supplies with which to treat Mr. Chapman, and they should not use Mr. Chapman's already-limited, personal supply.

33. Furthermore, BOP medical staff members, including Defendants Osagie and Camacho, do not replenish Mr. Chapman's prescribed medical supplies in a timely fashion, and, therefore, his ability to manage his blood sugar is even more limited because he runs out of the necessary medical supplies before BOP medical staff members, including Defendants Osagie and Camacho, provide him with more.

34. For a few months in 2014, BOP medical staff arbitrarily and improperly revoked Mr. Chapman's prescription for glucose gel tubes. Mr. Chapman's glucose gel tubes are a necessary tool for raising his blood sugar when he is hypoglycemic.

35. At recreation time, glucose gel tubes are Mr. Chapman's only method for combating hypoglycemia because they are the only form of sugar he is permitted to take to the exercise cages.

36. When BOP staff members, including Defendant Osagie, arrive at Mr. Chapman's cell because he is having a medical emergency, they do not bring their own glucose gel tubes; instead, they use Mr. Chapman's limited, personal supply of glucose gel tubes to treat his hypoglycemia. This depletion of Mr. Chapman's limited, personal supply

puts him at substantial risk for not being able to self-medicate when he is suffering hypoglycemia.

37. BOP medical staff also has arbitrarily and improperly reduced Mr. Chapman's ability to check his blood sugar.

38. According to BOP policies and procedures and community standards of care, Mr. Chapman needs to be able to check his blood sugar at critical times of day. At a minimum, these include when he wakes up, before he eats his meals, before and after he exercises, before he goes to sleep, and whenever he feels like his blood sugar is too high or too low.

39. At ADX, BOP medical staff initially provided Mr. Chapman with enough medical supplies to check his blood sugar five times a day: twice before receiving each insulin dose and three additional times. This meant that Mr. Chapman would not be able to check his blood sugar at other critical times of day.

40. In May 2014, BOP medical staff, including Defendants Osagie and Santini, arbitrarily and improperly reduced the amount of times Mr. Chapman can check his blood sugar to three-and-a-half times a day. Now Mr. Chapman cannot check his blood sugar at most critical times of day.

41. BOP medical staff members, including Defendant Santini, assess the effectiveness of Mr. Chapman's medication and other aspects of his diabetes management during Chronic Care appointments.

42. These Chronic Care appointments are Mr. Chapman's main source of medical attention. Unlike prisoners in general population at less restrictive prisons, Mr.

Chapman cannot access medical staff by walking into the prison clinic because he is in lockdown at ADX.

43. In the previous BOP institutions in which Mr. Chapman was incarcerated, the BOP provided Mr. Chapman with quarterly Chronic Care appointments. Furthermore, according to BOP policies and procedures, Mr. Chapman should receive at least quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes, his lack of blood sugar control, and his diabetic complications.

44. At ADX, the BOP, including Defendant Santini, provides Mr. Chapman with at most two Chronic Care appointments a year. Furthermore, during these appointments, BOP medical staff, including Defendant Santini, do not actually evaluate Mr. Chapman's diabetes management. For example, Mr. Chapman describes the problems he has with blood sugar control, and Defendant Santini listens passively and does nothing to address Mr. Chapman's problems, deliberately disregarding the obvious risk to Mr. Chapman's health that results from a lack of blood sugar control.

45. In addition to these infrequent and rote Chronic Care appointments, BOP medical staff, including Defendants Cordova, Osagie, and Camacho, delayed and denied and continue to delay and deny Mr. Chapman adequate medical care through improper and arbitrary insulin administration.

46. The delay and denial of Mr. Chapman's medication caused by Defendants Osagie and Camacho have excluded and continue to exclude him from BOP medical services because of his especially severe form of Type 1 diabetes.

47. The delay and denial of Mr. Chapman's medication caused by Defendants Osagie and Camacho have prevented him from utilizing the first key to managing diabetes, and

10

have substantially harmed him or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

48. In addition, Defendants denied and continue to deny Mr. Chapman the ability to manage his diabetes through diet, the second key to managing diabetes.

49. Mr. Chapman is substantially limited in his ability to eat, a major life activity, because of his especially severe form of Type 1 diabetes.

50. Unlike most people – both in and out of prison – Mr. Chapman cannot eat a meal for company, tradition, or pleasure. On the contrary, food is medicine for Mr. Chapman. He must always adhere to a strict dietary regimen and meal time schedule because of his Type 1 diabetes.

51. According to BOP policies and procedure and community standards of care, Mr. Chapman should eat a consistent amount of carbohydrates each meal and have a means to identify the amount of carbohydrates in each food item in his meals ("carbohydrate counting"). The purpose of carbohydrate counting is to allow Mr. Chapman the ability to plan the proper balance of diet, exercise, and medication.

52. Defendants, including Defendant Oliver, denied and continue to deny Mr. Chapman the ability to count his carbohydrates.

53. According to BOP policies and procedures and community standards of care, Mr. Chapman must eat in accordance with a set meal time schedule. According to community standards of care, Mr. Chapman should receive his meals within 45 minutes of receiving his insulin.

54. BOP staff, including Defendants Osagie and Camacho, rarely delivers insulin within 45 minutes of Mr. Chapman's morning or evening meal. Furthermore, BOP staff, including Defendants Osagie and Camacho, never delivers insulin with Mr. Chapman's lunch.

55. Defendants Osagie, Camacho, and Cordova's denial of coordination between morning and evening meals and insulin and Defendants Osagie, Camacho, and Cordova's denial of insulin with lunch cause Mr. Chapman substantial harm and put him at substantial risk of serious harm. According to BOP policies and procedures, the "best" result of uncoordinated meals and insulin delivery is hyperglycemia and the worst result is severe hypoglycemia.

56. The following graph plots the constant, life-threatening variation in Mr. Chapman's morning and evening meal times (shaded line) and insulin delivery times (fluctuating line) from January 2, 2013 to September 23, 2014. All of the data in the graph come from Mr. Chapman's BOP medical records.



57. Defendants Osagie, Camacho, and Cordova's denial of coordination between morning and evening meals and insulin and Defendants Osagie, Camacho, and Cordova's denial of insulin with lunch substantially limit Mr. Chapman's ability to eat and have excluded and continue to exclude him from BOP food services because of his especially severe form of Type 1 diabetes.

58. Defendants Osagie and Camacho's delay and denial of Mr. Chapman's ability to eat have prevented him from utilizing the second key to managing diabetes, and have substantially harmed him or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

59. Furthermore, Defendants denied and continue to deny Mr. Chapman the ability to manage his diabetes through exercise, the third and final key to managing diabetes.

60. Mr. Chapman is substantially limited in his ability to exercise, a major life activity, because of his especially severe form of Type 1 diabetes.

61. According to BOP policies and procedures and community standards of care, Mr. Chapman must exercise in order to manage his Type 1 diabetes, but he can only do so when his exercise is coordinated with his meals and medication. If this coordination is lacking, exercise causes Mr. Chapman's blood sugar to plummet to a dangerously low level.

62. At ADX, Mr. Chapman is locked in a 75~~0~~-square-feet-wide cell for an average of 22 to 24 hours a day. In March 2015, Mr. Chapman was moved into the J-unit in ADX's Step-Down Unit.

63. BOP staff allows Mr. Chapman at most fourteen hours of out-of-cell exercise a week. Some weeks BOP staff provides less exercise because BOP staff arbitrarily cancels recreation time. For example, BOP staff, under the direction and supervision of Defendant Oliver, canceled Mr. Chapman's recreation time for a week in 2014 because of Correctional Officers Appreciation Week.

64. Defendants' delay and denial of Mr. Chapman's ability to exercise have excluded and continue to exclude him from BOP recreational services because of his especially severe form of Type 1 diabetes.

65. Defendants' delay and denial of Mr. Chapman's ability to exercise have prevented him from utilizing the third key to managing diabetes; therefore, Defendants have denied and continue to deny Mr. Chapman the ability to manage his Type 1 diabetes, and Defendants' delay and denial have substantially harmed Mr. Chapman or put him at substantial risk of serious future harm, including loss of consciousness, diabetic

14

ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

> **ii.   Defendants Unreasonably Delayed and Denied and Continue to Unreasonably Delay and Deny Mr. Chapman the Ability to Manage His Type 1 Diabetes Because of Systematic and Gross Staffing Deficiencies.**

66. The systematic and gross deficiencies of BOP medical staff are part and parcel of Defendants' delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes.

67. Every day, Mr. Chapman depends on BOP medical staff to provide medical care for his especially severe form of Type 1 diabetes.

68. Every day, BOP medical staff must bring Mr. Chapman's morning and evening insulin.

69. The BOP medical staff members who bring Mr. Chapman insulin often fail to do so properly because they are new and inexperienced. BOP medical staff also has a high turn-over rate.

70. According to BOP policies and procedures, Defendant Oliver is in charge of identifying the BOP medical staff vacancies at ADX, and understaffing of medical staff negatively impacts the quality of prisoners' medical care.

71. Defendant Oliver's general understaffing of the BOP medical staff has led to delay and denial of medical care to Mr. Chapman.

72. According to BOP policies and procedures, additional staff members must be provided during nights, early mornings, and weekends.

73. Often, there is only one medical staff member on-call at ADX. When there is only one on-call medical staff member, that medical staff member will perform a variety of

tasks, such as administering medication and escorting ill prisoners to legal visits. While the medical staff member performs these tasks, he will be unavailable to respond if Mr. Chapman has a medical emergency.

74. In June 2014, Defendant Camacho told Mr. Chapman that his evening delivery of insulin occurred five hours late because Defendant Camacho was the only medical staff member currently at ADX, and that Defendant Camacho had to perform medical examinations on the new prisoners who had arrived earlier that day.

75. In August 2014, Defendant Camacho told Mr. Chapman that he would receive his insulin hours later than normal because all of the medical technicians had left BOP's employ.

### iii. Defendants' Delay and Denial of Adequate Medical Care for Mr. Chapman's Type 1 Diabetes Has Caused Him Substantial Harm and Put Him at Substantial Risk of Serious Harm.

76. The delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes caused by Defendants Osagie, Camacho, Santini, and Cordova have put him at substantial risk of loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

77. The delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes caused by Defendants Osagie, Camacho, Santini, and Cordova have caused Mr. Chapman to suffer worsening diabetic neuropathy, almost daily hypoglycemia, and frequent hyperglycemia.

78. According to BOP policies and procedures and the ADA, Diabetic neuropathy is a severe form of nerve damage that worsens when the blood sugar of a person with diabetes is out of control.

16

79. Mr. Chapman's diabetic neuropathy has worsened because Defendants have denied him the ability to control his blood sugar.

80. Defendant Osagie has denied Mr. Chapman the ability to control his blood sugar by improperly administering insulin and not refilling medical supplies in a timely manner.

81. Defendant Santini has denied Mr. Chapman the ability to control his blood sugar by taking no action whatsoever in response to Mr. Chapman's assertions during Chronic Care appointments that he is unable to control his blood sugar as a result of the inadequate medical care he is receiving.

82. Defendant Camacho has denied Mr. Chapman the ability to control his blood sugar by improperly administering insulin, not refilling medical supplies in a timely manner, refusing to refill medical supplies, and refusing to respond to Mr. Chapman's requests for help when he is hypoglycemic.

83. Defendant Cordova has denied Mr. Chapman the ability to control his blood sugar by failing to supervise Mr. Chapman's administration of insulin and failing to supervise Defendant Osagie and Defendant Camacho to ensure that they are providing Mr. Chapman with medical care in accordance with community standards of care for diabetes.

84. This worsening has caused Mr. Chapman to suffer tremors in his extremities and considerable pain. This worsening also has put Mr. Chapman at substantial risk of decreased blood flow, ulcers, chronic infections, and death.

85. Additionally, Defendants Osagie, Camacho, Cordova, and Santini's prevention of Mr. Chapman from controlling his blood sugar causes him to suffer almost daily hypoglycemia and frequent hyperglycemia.

86. The following graph plots the 238 times from February 14, 2011 to March 15, 2014, that Mr. Chapman's life was in danger because of hypoglycemia. All of the data in the graph come from Mr. Chapman's BOP medical records. Mr. Chapman, however, often experiences hypoglycemia of which BOP medical staff is unaware and thus does not record.



87. As of February 1, 2015, Mr. Chapman suffers hypoglycemia at least every fifth blood sugar check.

88. When Mr. Chapman is hypoglycemic he sweats profusely.

89. When Mr. Chapman is hypoglycemic he feels weak.

90. When Mr. Chapman is hypoglycemic his limbs are hard to move.

91. When Mr. Chapman is hypoglycemic he feels like his chest is going to explode.

92. When Mr. Chapman is hypoglycemic he has a gag reflex even when drinking water.

93. When Mr. Chapman is hypoglycemic he gets severe headaches.

94. When Mr. Chapman is hypoglycemic he feels foggy and has difficulty reading.

95. When Mr. Chapman is hypoglycemic he begins to shake.

96. When Mr. Chapman is hypoglycemic he can suffer neuroglycopenia, a medical condition in which a person suffering hypoglycemia experiences an altered mental state because of the lack of blood sugar in the brain. At ADX, Mr. Chapman has suffered neuroglycopenia over a hundred times.

97. When Mr. Chapman is hypoglycemic he can lose consciousness and be completely unaware for hours at a time. At ADX, Mr. Chapman has lost consciousness approximately a dozen times.

98. The frequency with which Mr. Chapman suffers hypoglycemia makes him less and less likely to be able to perceive when he is hypoglycemic, and, therefore, more and more dependent on BOP medical staff responding to his requests for medical assistance.

99. Despite Mr. Chapman's reliance and BOP policies and procedures which mandate that a BOP physician should be called when a person with diabetes is suffering hypoglycemia, a BOP physician is rarely called.

100.    Furthermore, Mr. Chapman relies on BOP medical staff, including Defendants Osagie, Camacho, and Santini, because he is at high risk for suffering hypoglycemia while sleeping.

101.    As a result of this high risk for hypoglycemia, Mr. Chapman is substantially

limited in his ability to sleep, a major life activity, because of his especially severe

form of Type 1 diabetes.

102.    In addition to hypoglycemia, the delay and denial of adequate medical care

caused by Defendants Osagie, Camacho, Santini, and Cordova have caused Mr.

Chapman to frequently suffer hyperglycemia, a very painful medical condition that

can lead to a life-threatening medical condition called diabetic ketoacidosis.

103.    The following graph plots the 546 times from January 19, 2011 to March 10,

2014, that Mr. Chapman's health was jeopardized because of hyperglycemia. All of

the data in the graph come from Mr. Chapman's BOP medical records. Mr. Chapman,

however, often experiences hypoglycemia of which BOP medical staff is unaware

and thus does not record.



104.    As of February 1, 2015, Mr. Chapman suffers hyperglycemia multiple times a

week.

105.   When Mr. Chapman is hyperglycemic he feels severe body pain.

106.   When Mr. Chapman is hyperglycemic he feels chest pain.

107.   When Mr. Chapman is hyperglycemic he feels weak.

108.   When Mr. Chapman is hyperglycemic he becomes dehydrated from frequent

urination (often every fifteen minutes).

109.   When Mr. Chapman is hyperglycemic he feels like his blood is on fire.

110.   When Mr. Chapman is suffering hyperglycemia, hypoglycemia, or another kind

of medical emergency, he presses the emergency call button in his cell in order to

summon BOP staff to his cell.

111.   Often, BOP staff does not respond after Mr. Chapman has pressed his emergency

call button. BOP staff members, including Defendant Camacho, have told Mr.

Chapman that they do not respond because Mr. Chapman was, in their opinion "fine,"

after such medical emergencies in the past.

112.   When BOP staff members do respond, they do so after more than 45 minutes has

elapsed. On more than one occasion, BOP staff has taken eight hours to respond. For

example, in 2013, Mr. Chapman nearly lost consciousness from hypoglycemia after

no BOP staff member ever responded when he pressed his emergency call button.

113.   When BOP staff members do respond and come to Mr. Chapman's cell, they will

determine if it is necessary to summon a BOP medical staff member. BOP

correctional staff members often unsuccessfully summon a BOP medical staff

member. For example, on multiple occasions, BOP staff called Defendant Osagie to

Mr. Chapman's cell because of Mr. Chapman's dangerous medical condition, and

Defendant Osagie never came.

114.    If BOP medical staff members, including Defendants Osagie and Camacho, do arrive, they come empty-handed. For example, when Mr. Chapman is hypoglycemic, BOP medical staff members, including Defendants Osagie and Camacho, rely on and use Mr. Chapman's limited, personal supply of glucose gel tubes and food he bought at the commissary to increase his blood sugar.

115.    In addition to the problems Mr. Chapman faces when he is able to press his emergency call button, Mr. Chapman often faces problems actually pressing the button.

116.    When Mr. Chapman is hyperglycemic, he often cannot press his emergency call button because he is in such extreme pain that he cannot control his extremities in order to press his button.

117.     When Mr. Chapman is hypoglycemic, his mental state can be so altered that he cannot realize that he should press his emergency call button. Moreover, because Mr. Chapman is in solitary confinement and BOP staff members rarely walk by his cell, Mr. Chapman must hope that prisoners in nearby cells will hear his manifestations of his altered mental state (such as spontaneous singing) or him fall and hit his concrete furniture or the concrete floor, and then press their emergency call buttons for him.

118.    The delay and denial of medical care for Mr. Chapman's serious medical need caused by Defendants Osagie, Camacho, Santini, and Cordova have caused and continues to cause him substantial harm and put him at substantial risk of serious harm.

**B.  Defendants Knew and Recklessly Disregarded that Their Inadequate Medical Care for Mr. Chapman's Type 1 Diabetes Caused and Continues to Cause Him Substantial Harm and Put Him at Substantial Risk of Serious Harm.**

108.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Cordova, and Santini knew that Mr. Chapman has an especially severe form of Type 1 diabetes that requires daily, specialized medical care.

109.    Mr. Chapman has discussed with BOP staff members, including Defendants, Osagie, Camacho, Cordova, and Santini, the fact that his form of Type 1 diabetes requires specialized care.

110.    The BOP has classified Mr. Chapman as a prisoner who requires more medical attention than the typical prisoner.

111.    Before Mr. Chapman was incarcerated in ADX, the BOP incarcerated him in United States Medical Center for Federal Prisoners in Springfield, Missouri ("Springfield"), the BOP's medical prison. Mr. Chapman's health was in grave danger after BOP medical staff at United States Penitentiary in Lewisburg, Pennsylvania, removed him from insulin entirely. The BOP kept Mr. Chapman in MCI Springfield for over a year in order to stabilize Mr. Chapman's diabetes management.

112.    During a 2011 Chronic Care appointment, a BOP physician wrote that "[Mr. Chapman] might prove to be a very brittle diabetic challenge . . . . We will have to monitor [him] very closely to prevent transfer back to [Springfield]."

113.    BOP policies and procedures and community standards of care state that blood sugar control is the goal of diabetes management. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew these policies and procedures and community standards of care, or Defendants Osagie, Camacho,

Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

> **i.  Defendants Knew and Recklessly Disregarded the Substantial Harm and Substantial Risk of Serious Harm to Mr. Chapman By Denying Him the Ability to Manage His Type 1 Diabetes Through Proper Medication, Diet, and Exercise.**

114.   BOP policies and procedures and community standards of care state that persons with diabetes can only control their blood sugar through proper medication, diet, and exercise. Since Mr. Chapman's arrival, Defendants either knew these policies and procedures and community standards of care, or Defendants should have known because the substantial risk to Mr. Chapman was obvious.

115.   Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that they were not providing Mr. Chapman with the proper medication, the first key to diabetes management, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

116.   According to BOP policies and procedures and community standards of care, persons with Type 1 diabetes need insulin to live. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew these policies and procedures and community standards of care, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

117.   Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova knew that BOP medical staff has prescribed Mr. Chapman a specific dosage of a specific form of insulin to administer to him in the morning and at night.

118.    On multiple occasions, Mr. Chapman has told BOP medical staff members, including Defendants Osagie and Camacho, that they are administering the wrong dosage or form of insulin.

119.    Since Mr. Chapman's arrival, Defendants, as medical staff, (including Defendants Osagie and Camacho) either knew that administering insulin diluted with air reduces the dosage of insulin Mr. Chapman receives, or Defendants should have known because the substantial risk to Mr. Chapman was obvious.

120.    On multiple occasions, Mr. Chapman has told BOP staff members, including Defendant Osagie, that they are administering insulin diluted with air.

121.    BOP policies and procedures mandate that insulin should be administered within 15 minutes of drawing it because it can spoil and become ineffective if not administered promptly. Since Mr. Chapman's arrival, Defendants Osagie and Camacho either knew these policies and procedures, or Defendants Osagie and Camacho should have known because the substantial risk to Mr. Chapman was obvious.

122.    In 2014, the BOP denied Mr. Chapman's Administrative Remedy #784108, in which he requested that BOP medical staff draw insulin into the syringe within 15 minutes of administering it. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

123.    In 2012 and 2013, Mr. Chapman's counsel sent letters to the former warden of ADX, David Berkebile, and requested that BOP medical staff draw insulin into the syringe within 15 minutes of administering it, and informed Warden Berkebile that BOP medical staff never does this. Moreover, Mr. Chapman's counsel stated that

community standards of care mandate that insulin should be administered within 15 minutes of drawing it into the syringe. In 2014, When Defendant Oliver became warden of ADX, Mr. Chapman's counsel forwarded the letters (the "2014 Warden Letter") to Defendant Oliver in order to apprise him of all of this information. Defendant Oliver did not respond to the 2014 Warden Letter nor did Defendant Oliver or any one else address any of Mr. Chapman's requests in the letter.

124.    On multiple occasions, Mr. Chapman has told BOP medical staff members, including Defendants Osagie and Camacho, that they are not administering insulin within a 15 minute window.

125.    Community standards of care mandate that Mr. Chapman have the proper medical supplies with which to manage his Type 1 diabetes. Defendants Osagie, Camacho, Santini, and Cordova either knew of the community standards of care or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

126.    BOP policies and procedures mandate that prisoners receive their medical supplies in a timely fashion. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew these policies and procedures, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

127.    On multiple occasions, Mr. Chapman has asked Defendants Osagie and Camacho to replenish his medical supplies in a timely fashion before he ran out of his critical supplies, to no avail.

128.    On multiple occasions, Mr. Chapman has asked Defendant Camacho to replenish his medical supplies, and Defendant Camacho has refused because, in Defendant Camacho's opinion, it is not his "job" as a Mid-Level Practitioner to do so.

129.    Since Mr. Chapman's arrival, Defendants either knew that Mr. Chapman has been prescribed a limited supply of glucose gel tubes each month, or Defendants should have known because the substantial risk to Mr. Chapman was obvious.

130.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that the only form of sugar that BOP staff allows Mr. Chapman to bring with him during recreation is his glucose gel tubes, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

131.    BOP policies and procedures mandate that persons with diabetes be able to check their blood sugar as needed. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew these policies and procedures, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

132.    Community standards of care mandate that persons with diabetes be able to check his blood sugar at least six times a day. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew the community standards of care, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

133.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that BOP staff members use Mr. Chapman's limited, personal supply and

27

interfere with his ability to self-medicate when he is hypoglycemic, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

134.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that BOP medical staff changed Mr. Chapman's prescription from being able to check his blood sugar five times a day to being able to check his blood sugar three-and-a-half times a day, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

135.    In 2014, the BOP denied Mr. Chapman's Administrative Remedy #784105, in which he requested to be able to check his blood sugar six times a day. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

136.    In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP medical staff allow Mr. Chapman to check his blood sugar six times a day, pursuant to community standards of care that mandate that Mr. Chapman be allowed to check his blood sugar at least six times a day.

137.    In 2014, Mr. Chapman wrote letters to Defendant Osagie, Defendant Camacho, and the BOP pharmacy, in which he requested that he be allowed to check his blood sugar more often.

138.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew Mr. Chapman needed more Chronic Care appointments so that BOP medical staff could assess the effectiveness of Mr. Chapman's medication and other aspects of his diabetes management, or Defendants Osagie, Camacho, Santini, and

Cordova should have known because the substantial risk to Mr. Chapman was obvious.

139.    BOP policies and procedures recommend that Mr. Chapman receive at least quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes, his lack of blood sugar control, and his diabetic complications. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew these policies and procedures, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

140.    In 2014, the BOP denied Mr. Chapman's Administrative Remedy #782449, in which he requested quarterly Chronic Care appointments. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

141.    In the 2014 Warden Letter, Mr. Chapman's counsel requested that Defendant Oliver provide Mr. Chapman with quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that Mr. Chapman receive quarterly Chronic Care appointments.

142.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that they have delayed and denied Mr. Chapman the ability to manage his diabetes through proper medication, the first key of diabetes management, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious. Despite Defendants Osagie, Camacho,

Santini, and Cordova's knowledge of this, they have recklessly disregarded the substantial risk to Mr. Chapman and acted unreasonably.

143. Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that they were not providing Mr. Chapman with the proper diet, the second key for diabetes management, or Defendants Osagie, Camacho, Santini, and Cordova should have known because the substantial risk to Mr. Chapman was obvious.

144. BOP policies and procedures and community standards of care recommend that persons with diabetes be allowed to count carbohydrates every meal. Since Mr. Chapman's arrival, Defendants, including Defendants Osagie and Santini, either knew these policies and procedures and community standards of care, or Defendants, including Defendants Osagie and Santini, should have known because the substantial risk to Mr. Chapman was obvious.

145. In 2012, the BOP denied Mr. Chapman's Administrative Remedy #629975, in which he requested to be allowed to count his carbohydrates. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

146. In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP staff provide Mr. Chapman with consistent amount of carbohydrates. Mr. Chapman's counsel stated that community standards of care recommend that a person with diabetes be provided a consistent amount of carbohydrates.

147. BOP policies and procedures and community standards of care mandate that a prisoner with diabetes receive his meals at consistent times that coordinate with

insulin delivery times. Since Mr. Chapman's arrival, Defendants either knew these policies and procedures and community standards of care, or Defendants should have known because the substantial risk to Mr. Chapman was obvious.

148.     According to community standards of care, persons with diabetes should receive their meals within 45 minutes of receiving insulin. Since Mr. Chapman's arrival, Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, either knew the community standards of care, or Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, should have known because the substantial risk to Mr. Chapman was obvious.

149.     BOP policies and procedures state that the "best" result of uncoordinated meals and insulin delivery is hyperglycemia and the worst result is severe hypoglycemia. Since Mr. Chapman's arrival, Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, either knew of these policies and procedures or Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, should have known because the substantial risk to Mr. Chapman was obvious.

150.     In 2014, the BOP denied Mr. Chapman's Administrative Remedy #781510, in which he requested that BOP staff deliver his insulin at consistent times and within 45 minutes of his meals. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

151.     In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP staff provide Mr. Chapman with meals at consistent times. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that a person with diabetes consume meals and insulin within a 45 minute window.

152.    Since Mr. Chapman's arrival, Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, either knew that they have delayed and denied Mr. Chapman the ability to manage his diabetes through proper diet, the second key of diabetes management, or Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, should have known because the substantial risk to Mr. Chapman was obvious. Despite Defendants' knowledge of this, they have recklessly disregarded the substantial risk to Mr. Chapman and acted unreasonably.

153.    Since Mr. Chapman's arrival, Defendants, including Defendant Santini, either knew that they were not providing Mr. Chapman with the proper amount of exercise, the third key for diabetes management, or Defendants, including Defendant Santini, should have known because the substantial risk to Mr. Chapman was obvious.

154.    BOP policies and procedures and community standards of care state that persons with diabetes exercise the proper amount in order to manage their diabetes. Since Mr. Chapman's arrival, Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, either knew these policies and procedures and community standards of care, or Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, should have known because the substantial risk to Mr. Chapman was obvious.

155.    Since Mr. Chapman's arrival, Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, either knew that BOP staff provides Mr. Chapman with at most ten hours of out-of-cell exercise a week and that the rest of the time Mr. Chapman is in lockdown in a 70-square-foot-wide cell, or Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, should have known because the substantial risk to Mr. Chapman was obvious.

156.    In 2011, the BOP denied Mr. Chapman's Administrative Remedy #630355, in

which he requested BOP staff allow him to exercise more in order to manage his

Type 1 diabetes. Defendant Oliver, who approves or denies the first level of the

grievance process for prisoners at ADX, denied this request.

157.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant Oliver of

the importance of exercise for the management of Mr. Chapman's Type 1 diabetes.

158.    Since Mr. Chapman's arrival, Defendants, including Defendants Osagie,

Camacho, Santini, and Cordova, either knew or should have known that they have

delayed and denied Mr. Chapman the ability to manage his diabetes through proper

exercise, the third key of diabetes management, or Defendants, including Defendants

Osagie, Camacho, Santini, and Cordova, should have known because the substantial

risk to Mr. Chapman was obvious. Despite Defendants' knowledge of this, they have

recklessly disregarded the substantial risk to Mr. Chapman and acted unreasonably.

159.    Despite Defendants Osagie, Camacho, Santini, and Cordova's knowledge of these

risks to Mr. Chapman's health caused by their inadequate provision of medical care –

or despite the obviousness of those risks – Defendants Osagie, Camacho, Santini, and

Cordova have taken no actions to assist Mr. Chapman in the ability to control his

blood sugar by properly administering his insulin, providing him with sufficient

medical supplies to check his blood sugar, or coordinating his meals with his insulin

and his exercise.

> **ii.    Defendant Oliver Knew and Recklessly Disregarded the Substantial
>         Risk of Serious Harm to Mr. Chapman Because of Systematic and
>         Gross Staffing Deficiencies.**

160.   BOP policies and procedures state that the warden of a BOP prison is in charge of identifying the BOP medical staff vacancies at the prison of which he is warden. Since Mr. Chapman's arrival, the BOP Defendant Oliver either knew these policies and procedures, or the BOP and Defendant Oliver should have known because the substantial risk to Mr. Chapman was obvious.

161.   BOP policies and procedures state that the understaffing of medical staff negatively impacts the quality of prisoners' medical care. Since Mr. Chapman's arrival, the BOP and Defendant Oliver either knew these policies and procedures, or the BOP and Defendant Oliver should have known because the substantial risk to Mr. Chapman was obvious.

162.   BOP policies and procedures mandate that additional medical staff members be provided during nights, early mornings, and weekends. Since Mr. Chapman's arrival, the BOP and Defendant Oliver either knew these policies and procedures, or Defendant Oliver should have known because the substantial risk to Mr. Chapman was obvious.

163.   In 2014, the BOP denied Mr. Chapman's Administrative Remedy #785175 in which he requested that the BOP employ additional medical staff for insulin administration. Defendant Oliver, who approves or denies the first level of the grievance process for prisoners at ADX, denied this request.

164.   In the 2014 Warden Letter, Mr. Chapman's counsel requested that the BOP employ additional medical staff to prevent unnecessary delays during insulin administration, and that the BOP properly train all medical staff members.

165.    Since Mr. Chapman's arrival, the BOP and Defendant Oliver either knew that the

BOP staff at ADX was rife with systematic and gross staffing deficiencies, or the

BOP and Defendant Oliver should have known because the substantial risk to Mr.

Chapman was obvious. Despite the BOP's and Defendant Oliver's knowledge of this,

they have recklessly disregarded the substantial risk to Mr. Chapman and acted

unreasonably.

> **iii.    Defendants Knew and Recklessly Disregarded that Mr. Chapman
> Suffered and Continues to Suffer Diabetic Neuropathy,
> Hypoglycemia, and Hyperglycemia. Defendants Knew and Recklessly
> Disregarded the Substantial Risk of Loss of Consciousness, Diabetic
> Ketoacidosis, Kidney Failure, Blindness, Heart Failure, Coma, and
> Imminent Death to Mr. Chapman.**

166.    BOP policies and procedures and the ADA state that diabetic neuropathy is

treated by blood sugar control. Since Mr. Chapman's arrival, Defendants either knew

these policies and procedures and the ADA's recommendation, or Defendants should

have known because the substantial risk to Mr. Chapman was obvious.

167.    In a 2011 clinical encounter with Mr. Chapman, a BOP physician wrote in Mr.

Chapman's medical record that Mr. Chapman developed a form of diabetic

neuropathy as a complication of his Type 1 diabetes.

168.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova

knew that Mr. Chapman has suffered hypoglycemia and remains at substantial risk of

suffering hypoglycemia.

169.    BOP policies and procedures mandate that a BOP physician be called when a

person with diabetes is suffering hypoglycemia. Since Mr. Chapman's arrival,

Defendants, including Defendants Osagie, Camacho, Santini, and Cordova, either

knew these policies and procedures, or Defendants, including Defendants Osagie,

Camacho, Santini, and Cordova, should have known because the substantial risk to Mr. Chapman was obvious.

170.   Since Mr. Chapman's arrival, Defendants, including Defendants Osagie and Santini, knew Mr. Chapman suffered hypoglycemia 238 times from February 14, 2011 to March 15, 2014, because these episodes were documented in his medical records.

171.   In a 2011 Chronic Care appointment with Mr. Chapman, a BOP physician wrote in Mr. Chapman's medical record that "[Mr. Chapman] reports severe hypoglycemic levels to 'to 0' in the past."

172.   In a 2013 Clinical Encounter with Mr. Chapman, Defendant Osagie wrote in Mr. Chapman's medical record that "[Mr. Chapman is] a known diabetic who periodically experiences severe hypoglycemic episode[s]."

173.   In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant Oliver that Mr. Chapman is at an increased risk of suffering hypoglycemia because of his especially severe form of Type 1 diabetes.

174.   In 2014, Mr. Chapman sent Defendant Osagie a letter from Mohammed Shakir, M.D., an endocrinologist who treated Mr. Chapman before his incarceration (the "2014 Dr. Shakir Letter"). In the letter, Dr. Shakir warned that Mr. Chapman is at high risk of hypoglycemia and that Mr. Chapman may suffer hypoglycemia while sleeping.

175.   In 2014, Mr. Chapman informed Defendant Santini that he shakes and suffers frequent defecation (itself an indication of low blood sugar). Defendant Santini did not do anything to address Mr. Chapman's symptoms, which are ongoing.

176.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova knew that Mr. Chapman has suffered hyperglycemia and remains at substantial risk of suffering hyperglycemia.

177.    Since Mr. Chapman's arrival, Defendants, including Defendants Osagie and Santini, knew that Mr. Chapman suffered hyperglycemia 546 times from January 19, 2011 to March 10, 2014, because these episodes were documented in his medical records.

178.    In the 2014 Shakir Letter, Dr. Shakir warned Defendant Osagie that Mr. Chapman is at high risk of suffering hyperglycemia.

179.    On multiple occasions, Defendant Camacho told Mr. Chapman that Defendant Camacho will not come to Mr. Chapman's assistance when he is hyperglycemic because, in Defendant Camacho's opinion, Mr. Chapman will not die immediately from hyperglycemia.

180.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that Mr. Chapman is at substantial risk of developing diabetic ketoacidosis when his hyperglycemia is left untreated, or Defendants should have known because the substantial risk to Mr. Chapman was obvious.

181.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant Oliver that failure to treat hyperglycemia can cause diabetic ketoacidosis.

182.    In the 2014 Shakir Letter, Dr. Shakir warned Defendant Osagie that Mr. Chapman is at high risk of diabetic ketoacidosis.

183.    Since Mr. Chapman's arrival, Defendants Osagie, Camacho, Santini, and Cordova either knew that they have caused Mr. Chapman to suffer and put him at substantial

risk of worsening diabetic neuropathy, almost daily hypoglycemia, and frequent

hyperglycemia, or Defendants Osagie, Camacho, Santini, and Cordova should have

known because the substantial risk to Mr. Chapman was obvious. Despite Defendants

Osagie, Camacho, Santini, and Cordova's knowledge of this, they have recklessly

disregarded the substantial risk to Mr. Chapman and acted unreasonably by refusing

to take any actions to prevent Mr. Chapman from suffering these symptoms,

including properly administering his insulin, providing him with adequate medical

supplies to test his blood sugar, and coordinating his meals with his insulin.

184.     Therefore, all of the Defendants have acted with deliberate indifference to Mr.

Chapman's serious medical need.

## V.     Claims for Relief

## FIRST CLAIM FOR RELIEF

### (Eighth Amendment Violation – Inadequate Medical Care)

### (Against All Defendants)

183.     Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set

herein.

184.     At all times relevant to the allegations in this Complaint, Defendants acted or

failed to act under color of federal law.

185.     At all times relevant to the allegations in this Complaint, all of the Defendants

were acting pursuant to federal custom, policy, or practice in their acts and omissions

pertaining to Mr. Chapman's inadequate medical care for his Type 1 diabetes.

186.    Under the Eighth Amendment to the Constitution, prison officials must provide adequate medical care to prisoners, who rely entirely on the prison system for their medical needs.

187.    Mr. Chapman, while housed at ADX, was and is constitutionally entitled to receive adequate medical care for his serious medical need, Type 1 diabetes. The right to receive adequate medical care is a clearly established right, and at no time during Mr. Chapman's housing at ADX would a reasonable prison official have thought it lawful to deny Mr. Chapman his constitutional right to adequate medical care.

188.    Acting with deliberate indifference to Mr. Chapman's constitutional right to receive adequate medical care, all of the Defendants delayed and denied and continue to delay and deny Mr. Chapman medical care in accordance with the community standards of care and BOP policies and procedures for treating Type 1 diabetes.

189.    The delay and denial of inadequate medical care to Mr. Chapman caused by all of the Defendants caused and continue to cause him to suffer substantial harm that serves no penological purpose, namely, considerable pain and suffering, hyperglycemia, hypoglycemia, worsening neuropathy, and loss of consciousness.

190.    The delay and denial of inadequate medical care to Mr. Chapman caused by all of the Defendants caused and continue to cause him to be subject to substantial risk of serious harm, namely, considerable pain and suffering, hyperglycemia, hypoglycemia, consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

191.    All of the Defendants knew or should have known that their inadequate medical care caused Mr. Chapman to be subject to substantial harm and substantial risk of serious harm.

192.    Defendant Oliver, as warden of ADX, promulgated, created, implemented or possessed responsibility for the policies and procedures concerning Mr. Chapman's medical care that caused Mr. Chapman substantial harm and substantial risk of serious harm. Defendant Oliver acted with a mindset of deliberate indifference because he knew or should have known that the policies and procedures at ADX caused Mr. Chapman to be subject to substantial harm and substantial risk of serious harm.

193.    All of the Defendants' acts and omissions are the proximate cause of Mr. Chapman's deprivation of rights under the Eighth Amendment.

194.    The acts or omissions of all of the Defendants were conducted within the scope of their official duties and employment.

## SECOND CLAIM FOR RELIEF

### (Sect. 504 Rehabilitation Act – Disability Discrimination)

### (Against all Defendants)

195.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set herein.

196.    ADX is a federal administrative maximum security penitentiary that receives and benefits from federal financial assistance as the term "federal financial assistance" is used in 29 U.S.C. § 794.

197.   Mr. Chapman is an individual with a physical disability within the meaning of 42

U.S.C. § 12102 (as incorporated into 29 U.S.C. § 705(9)(B)) because his diabetes

constitutes a physical impairment that substantially limits him in several major life

activities, including, but not limited to, exercising, eating, sleeping, and caring for

himself. These limitations on his life activities have had a profound effect on Mr.

Chapman's life as described above. Mr. Chapman also has a record of an impairment

that substantially limits the above-listed major life activities, and also is regarded as

having such an impairment.

198.   As a prisoner in the custody of the BOP, Mr. Chapman is qualified for the

programs, activities, aids, benefits, and services offered by the BOP.

199.   Mr. Chapman - with or without reasonable modifications to rules, policies, or

practices - met and continues to meet the essential eligibility requirements for the

receipt of services or the participation in programs or activities provided by

Defendants. Thus, Mr. Chapman is a "qualified handicapped person" within the

meaning of the 29 U.S.C. § 794.

200.   All of the Defendants have discriminated against Mr. Chapman on the basis of his

disability in violation of 29 U.S.C. § 794 and its implementation of BOP policies and

procedures.

201.   Such discrimination includes, but is not limited to, the exclusion of Mr. Chapman

on the basis of his disability from services and programs afforded to prisoners. These

programs and services include, but are not limited to, medical services, food services,

and recreational services. All of the Defendants have also failed to make reasonable

accommodations and modifications, to policies, practices, and procedures that are

necessary for Mr. Chapman to be able to participate in Defendants' services,

programs and activities, including but not limited to medical services, food services,

and recreation.

202.    All of the Defendants' discrimination is intentional and represents deliberate

indifference to the strong likelihood that pursuit of the actions and policies at issue in

this Complaint would likely result in a violation of federally protected rights.

## VI.    Prayer for Relief

Plaintiff requests that this Court enter judgment for Plaintiff and against each of

the Defendants, and award Plaintiff all relief allowed by law, including but not

limited to the following:

203.    an injunction be entered against all Defendants in their official capacities

requiring medical care for Mr. Chapman's Type 1 diabetes be provided in accordance

with community standards of care;

204.    a declaration that Mr. Chapman has been deprived by Defendants of his right to

be free from cruel and unusual punishment in violation of the Eighth Amendment to

the Constitution;

205.    a declaration that Defendants have discriminated against Mr. Chapman on the

basis of his Type 1 diabetes in violation of Section 504 of the Rehabilitation Act;

206.    compensatory damages against Defendants Cordova, Santini, Osagie, and

Camacho in their individual capacities, including damages for emotional distress,

humiliation, loss of enjoyment of life, and other pain and suffering on all claims

allowed by law in an amount to be determined at trial;

207.   punitive damages on all claims allowed by law and in an amount to be determined

at trial;

208.   nominal damages on all claims allowed by law and in an amount to be determined

at trial;

209.   attorneys' fees and costs associated with this action, including expert witness fees,

on all claims allowed by law;

210.   any further relief that this Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Dated: May 22, 2015

Respectfully submitted,

STUDENT LAW OFFICE

/s/ Laura Rovner
Laura Rovner
Lauren Fontana
University of Denver Sturm College of Law
2255 E. Evans Ave., Ste. 335
Denver, CO 80208
Phone: (303) 871-6140
Email: lrovner@law.du.edu

## CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2015, I filed the foregoing Amended Complaint using the Court's CM/ECF system, which will send notice of the filing via electronic mail to the following:

zeyen.wu@usdoj.gov
Zeyen Wu

*Counsel for Defendants*

*s/ Laura Rovner*
_____

Laura Rovner