**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 15-cv-000279-WYD-KLM

SEIFULLAH CHAPMAN,

      Plaintiff,

v.

FEDERAL BUREAU OF PRISONS;
GEORGE SANTINI, MD, in his individual capacity;
ANTHONY OSAGIE, PA, in his individual capacity; and
RONALD CAMACHO, PA, in his individual capacity;

      Defendants.

---

**SECOND AMENDED COMPLAINT**

---

    Plaintiff Seifullah Chapman hereby submits this Second Amended Complaint for

violation of his rights under the Eighth Amendment to the United States Constitution and Section

504 of the Rehabilitation Act of 1973.

### I.    Introduction

1. Mr. Chapman is currently incarcerated at the United States Penitentiary – Terre Haute

    ("USP-Terre Haute") in Terre Haute, Indiana. At the time Mr. Chapman initiated this

    lawsuit, Defendant Federal Bureau of Prisons ("BOP") incarcerated him in solitary

    confinement at the United States Penitentiary – Administrative Maximum ("ADX") in

    Florence, Colorado. For his entire adult life, Mr. Chapman has suffered from an especially

    severe form of Type 1 diabetes. This serious medical need and physical disability requires

consistency in every aspect of Mr. Chapman's daily medical care. If this consistency is

lacking in any aspect of Mr. Chapman's medical care, from proper insulin administration, to

coordination of his insulin and food, to the number of doctor's appointments he receives, he

is substantially harmed or put at substantial risk of serious future harm, including loss of

consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure,

cardiovascular disease, neuropathy, kidney damage/failure, retinopathy, cataracts, cognitive

impairment, skin problems, bone and joint problems, coma, and imminent death.

Defendants, however, have provided and continue to provide consistently inconsistent

medical care to Mr. Chapman. By doing so, Defendant BOP endangers his life on a daily

basis.

## II.    Jurisdiction and Venue

2.   This Court possesses subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

1343(a)(4).

3.   Venue is proper within this district pursuant to 28 U.S.C. § 1391 because a substantial part of

the events giving rise to the claims occurred in this judicial district.

## III.    Parties

4.   Plaintiff Seifullah Chapman, who has an especially severe form of Type 1 diabetes, is a

federal prisoner in the custody of Defendant BOP. Mr. Chapman has been continuously

confined within the custody of Defendant BOP and, since November 2015, Defendant BOP

has housed him in USP-Terre Haute. From December 2010 to August 2015, Defendant BOP

confined Mr. Chapman at ADX. From August 2015 to November 2015, Defendant BOP

confined Mr. Chapman at the United States Penitentiary-Florence ("USP-Florence"), directly across the street from ADX.

5.  Defendant BOP is a federal executive agency and a subdivision of the United States Department of Justice. As such, Defendant BOP is responsible for the administration of federal prisons, including ADX, USP-Florence, and USP-Terre Haute. Defendant BOP maintains physical custody of Mr. Chapman, and, as such, Defendant BOP determines the prison in which it will confine Mr. Chapman at any particular time. The health care mission of Defendant BOP is to provide appropriate and necessary medical services to prisoners by professional staff.

6.  Defendant George Santini, MD, is a physician employed at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for consulting with other BOP medical staff members at ADX, training and mentoring BOP medical staff members at ADX, and directly evaluating and treating prisoners who have severe illnesses and medically complex conditions at ADX. At all times relevant to this action, Defendant Santini acted in the course and scope of his employment.

7.  Defendant Anthony Osagie, PA, is a Mid-Level Practitioner at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible for answering requests for medical assistance, managing reoccurring conditions, and responding to medical emergencies. At all times relevant to this action, Defendant Osagie acted in the course and scope of his employment.

8.  Defendant Ronald Camacho, PA, is a Mid-Level Practitioner at ADX, and, as such, is responsible for the medical care of prisoners housed at ADX. Specifically, he is responsible

for answering requests for medical assistance, managing reoccurring conditions, and responding to medical emergencies. At all times relevant to this action, he acted in the course and scope of his employment.

### IV. Statement of Facts

9. Over the course of the past decade, Defendant BOP has confined Mr. Chapman in numerous federal prisons. These prisons include the United States Penitentiary – Lewisburg ("USP-Lewisburg"), the Federal Medical Center-Springfield ("FMC-Springfield"), ADX, USP-Florence, and USP-Terre Haute.

10. Regardless of where Mr. Chapman is incarcerated, Defendant BOP is constitutionally and statutorily obligated to provide him appropriate and necessary medical services consistent with the community standards of care for Type 1 diabetes. Defendant BOP is also statutorily obligated to provide Mr. Chapman, a "qualified handicapped individual," with equal access to prison programs, services, and activities.

11. Yet, as fully outlined below, Defendant BOP has systemically failed to provide adequate medical care to Mr. Chapman throughout his incarceration, exhibiting a pattern and practice of historical institutional indifference to his serious medical needs. Defendant BOP also has failed to make reasonable accommodations and/or modifications to rules, policies, and practices that are necessary to provide Mr. Chapman equal access to its programs, services, and activities.

**A. Defendants Unreasonably Delayed and Denied and Continue to Unreasonably Delay and Deny Mr. Chapman Adequate Medical Care for His Serious Medical Need, Type 1 Diabetes.**

12. In 1994, prior to his incarceration, military doctors diagnosed Mr. Chapman with Type 1 diabetes, a serious medical need and physical disability that requires daily, specialized medical care.

13. Diabetes is a metabolic condition that makes it difficult for persons with diabetes to control their blood sugar. Persons with Type 1 diabetes, in particular, struggle to control their blood sugar. Mr. Chapman struggles even more than the typical person with Type 1 diabetes because of his especially severe form of Type 1 diabetes and his hyperthyroidism.[1]

14. According to Defendant BOP policies and procedures and community standards of care, blood sugar control is the goal of Mr. Chapman's diabetes management. This means that Mr. Chapman's blood sugar should remain between 70 and 180 milligrams per deciliter ("mg/dl"). If his blood sugar is ever outside that range, he becomes hypoglycemic (meaning he has low blood sugar) or he becomes hyperglycemic (meaning he has high blood sugar). When Mr. Chapman is hypoglycemic or hyperglycemic, he is put at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

---

[1] According to the Mayo Clinic, hyperthyroidism accelerates the body's metabolism and complicates an individual's ability to control his blood sugar. Hyperthyroidism can cause sudden weight loss, rapid or irregular heartbeat, sweating, nervousness, and irritability.

15. While at ADX, Defendants BOP, through its agents Defendants Osagie, Camacho, and Santini prevented Mr. Chapman from achieving blood sugar control by delaying and denying him the necessary tools and care for glycemic control.

16. Defendant BOP continues to prevent Mr. Chapman from achieving blood sugar control by delaying and denying him the necessary tools and care for glycemic control.

17. As a result of the sub-standard care provided by Defendants BOP Osagie, Camacho, and Santini at ADX, Mr. Chapman suffered from worsening diabetic neuropathy (a severe form of nerve damage that can lead to decreased blood flow, ulcers, chronic infections, and death), almost daily hypoglycemia (a life-threatening condition), and frequent hyperglycemia (a painful condition which can cause long-term complications, including cardiovascular disease, kidney damage, retinopathy, cataracts, cognitive impairment, skin problems, and bone and joint problems).

18. Mr. Chapman continues to suffer frequent episodes of hypoglycemia and hyperglycemia today as a result of the continued substandard care provided by Defendant BOP and Defendant BOP's failure to make reasonable modifications to its rules, policies, and practices.

     **i.    Defendants Unreasonably Delayed and Denied and Continue to Unreasonably Delay and Deny Mr. Chapman the Ability to Manage His Type 1 Diabetes Through Proper Medication, Diet, and Exercise.**

19. According to Defendant BOP policies and procedures and community standards of care, Mr. Chapman can only control his blood sugar through the three keys of diabetes management: proper medication, diet, and exercise.

20. While at ADX, Mr. Chapman relied on Defendant BOP, through its agents Defendants Osagie, Camacho, and Santini, among others, for proper medication, diet, and exercise.

21. Defendants BOP, Osagie, Camacho, and Santini denied, and Defendant BOP continues to deny, Mr. Chapman the ability to manage his diabetes through medication, the first key to managing diabetes.

22. Mr. Chapman is substantially limited in several major life activities, including caring for himself and eating, as well as in the major bodily functions performed by his endocrine system, because of his especially severe form of Type 1 diabetes.

23. According to BOP policies and procedures and the Americans Diabetes Association (the "ADA"), Mr. Chapman requires insulin to live because of his Type 1 diabetes.

24. While at ADX, Defendant BOP medical staff prescribed a specific dosage of a specific form of insulin to administer to Mr. Chapman in the morning and at night.

25. In March 2011, BOP medical staff, including Defendant Osagie, arbitrarily changed Mr. Chapman's insulin prescription. This change caused Mr. Chapman's health to deteriorate so much that he was hospitalized in the ADX infirmary. BOP medical staff, including Defendant Osagie, did not change Mr. Chapman's insulin prescription back to the original order for 18 months, during which time Mr. Chapman's blood sugar levels fluctuated dramatically. In this 18-month period of time, Mr. Chapman discussed with Defendant Osagie his need to return to his previous insulin prescription because of his out of control blood sugar, but Defendant Osagie did not reinstate Mr. Chapman's previous insulin prescription.

26. At USP-Terre Haute, Defendant BOP again arbitrarily changed Mr. Chapman's insulin prescription when he first arrived in November 2015. At that time, Defendant BOP provided Mr. Chapman Novolin insulin in the mornings. Novolin is a slow-acting form of insulin, so Mr. Chapman's blood sugar would run very high in the mornings until the Novolin took effect just before lunch. This caused Mr. Chapman's blood sugar numbers to crash just before lunch pill line, which made it incredibly difficult for him to manage his diabetes. Mr. Chapman repeatedly raised this issue with Dr. William Wilson, Defendant BOP's clinical director at USP-Terre Haute, but Dr. Wilson ignored Mr. Chapman's requests to change his prescription to a faster-acting insulin for several months. Eventually, Dr. Wilson finally changed Mr. Chapman's insulin prescription to Lispro, a faster-acting form of insulin.

27. On multiple occasions, Defendant BOP medical staff members at ADX, including Defendants Osagie and Camacho, arrived at Mr. Chapman's cell with the wrong dosage of insulin.

28. On multiple occasions, Defendant BOP medical staff members, including Defendants Osagie and Camacho, arrived at Mr. Chapman's cell with the wrong form of insulin.

29. Upon information and belief, Defendant BOP continues to provide Mr. Chapman the wrong type of insulin at pill line in USP-Terre Haute. Sometimes, after receiving his insulin injection, Mr. Chapman's response to the insulin (i.e., the changes to his blood sugar) are similar to the responses after he received Novolin rather than the fast-acting Lispro he is prescribed and needs. At USP-Terre Haute, Mr. Chapman receives his insulin through a pill line window. Therefore, he cannot see what Defendant BOP nurses or other medical staff are

doing when they draw up the insulin, so it is impossible for him to know whether Defendant BOP is providing him the correct type of insulin.

30. Even when Defendant BOP medical staff members at ADX, including Defendants Osagie and Camacho, arrived at Mr. Chapman's cell with the correct dosage and form of insulin, Defendant BOP medical staff members at ADX, including Defendants Osagie and Camacho, often improperly administered the insulin.

31. According to Defendant BOP policies and procedures, insulin should be drawn within 15 minutes of administering it because it can spoil and become ineffective if not administered promptly.

32. Defendant BOP medical staff members at ADX, including Defendants Osagie and Camacho, often drew insulin hours before administering it to Mr. Chapman such that by the time he received it, it had solidified or otherwise become less effective.

33. According to Defendant BOP policies and procedures, insulin also should be drawn without any air in the syringe because otherwise Mr. Chapman will receive less than his prescribed dosage of insulin.

34. Defendant BOP medical staff, including Defendant Osagie and BOP staff at USP-Terre Haute, will often allow air into the syringe when drawing insulin, and, as a result, administer the wrong dosage of insulin to Mr. Chapman.

35. Defendant BOP continues to improperly administer Mr. Chapman's insulin at USP-Terre Haute. Defendant BOP's nurses and other medical providers often do not draw up the correct dose of insulin at pill line. Some of Defendant BOP's medical providers give Mr. Chapman only six units of insulin when his sliding scale calls for eight or ten units. Mr. Chapman often

has to ask Defendant BOP medical staff whether they provided him the right amount. If not, Mr. Chapman must request that Defendant BOP medical staff draw up an additional two to four units of insulin to make sure he receives the proper amount.

36. In addition, on at least one occasion, an agent of Defendant BOP, Nurse Porter, attempted to give Mr. Chapman 57 units of insulin when his sliding scale prescription indicated that he needed 27 units of insulin. Upon information and belief, had Defendant BOP agent Nurse Porter given Mr. Chapman 57 units of insulin, he could have died.

37. Additionally, Defendant BOP medical staff members at USP-Terre Haute sometimes withdraw the insulin syringe from Mr. Chapman's body before the entire dose has been released into his body, squirting insulin on his arm or side. When this happens, it is impossible to know whether Mr. Chapman received his proper dose, and Mr. Chapman has no way to know how much he should eat or exercise in order to appropriately manage his blood sugar numbers.

38. In addition to Defendant BOP medical staff's (including Defendants Osagie and Camacho) arbitrary and improper insulin administration, Defendant BOP medical staff at ADX arbitrarily and improperly changed Mr. Chapman's prescription for medical supplies. Mr. Chapman's medical supplies include a personal glucometer, lancets, and test strips, which he needs to check his blood sugar, and glucose gel tubes, which he needs to raise his blood sugar when he is hypoglycemic.

39. According to community standards of care, a person with diabetes needs to have the battery changed in his glucometer or have his glucometer replaced every two years because the

glucometer becomes less accurate as the battery dies. Most glucometers do not show the user that the battery is dying.

40. Mr. Chapman received a new personal glucometer in May 2013. From May 2013 until September 2016, Defendant BOP staff members, including Defendants Osagie and Santini, did not provide Mr. Chapman with new batteries for his glucometer or a new glucometer; thus, the glucometer was likely inaccurate. In September 2016, Defendant BOP provided Mr. Chapman a new glucometer, an "ARKRAY" brand glucometer.

41. On multiple occasions, Defendant BOP medical staff members at USP-Terre Haute and ADX, including Defendants Osagie and Camacho, have depleted Mr. Chapman's already insufficient medical supplies by making him use the medical supplies prescribed for his own personal use. Defendant BOP medical staff members, including Defendants Osagie and Camacho, are responsible for using their own medical supplies with which to treat Mr. Chapman, and they should not use Mr. Chapman's already-limited, personal supply.

42. Furthermore, Defendant BOP medical staff members at ADX, including Defendants Osagie and Camacho, did not replenish Mr. Chapman's prescribed medical supplies in a timely fashion. Therefore, Mr. Chapman's ability to manage his blood sugar at ADX was even more limited because he ran out of the necessary medical supplies before BOP medical staff members, including Defendants Osagie and Camacho, provided him with more.

43. Defendant BOP continues to fail to replenish Mr. Chapman's lancets in a timely manner at USP-Terre Haute. This causes Mr. Chapman to regularly run out of lancets, and he is then forced to use a sewing needle to test his blood sugar. Forcing Mr. Chapman to use a sewing needle is unsanitary and unsafe.

44. Although Defendant BOP finally provided Mr. Chapman a new glucometer in September 2016, the "ARKRAY" brand glucometer often exhibits an "error" reading when Mr. Chapman tests his blood, which requires him to retest and further deplete his test strip and lancet supplies.

45. For a few months in 2014, Defendant BOP medical staff arbitrarily and improperly revoked Mr. Chapman's prescription for glucose gel tubes. Mr. Chapman's glucose gel tubes are a necessary tool for raising his blood sugar when he is hypoglycemic.

46. At recreation time at ADX, glucose gel tubes were Mr. Chapman's only method for combating hypoglycemia because they are the only form of sugar he was permitted to take to the ADX exercise cages.

47. When Defendant BOP staff members at ADX, including Defendant Osagie, arrived at Mr. Chapman's cell because he was having a medical emergency, they did not bring their own glucose gel tubes; instead, they used Mr. Chapman's limited, personal supply of glucose gel tubes to treat his hypoglycemia. This depletion of Mr. Chapman's limited, personal supply put him at substantial risk for not being able to self-medicate when he was suffering hypoglycemia.

48. At USP-Terre Haute, Defendant BOP continues to fail to provide Mr. Chapman a sufficient supply of life-saving glucose to use when he experiences hypoglycemia. At USP-Terre Haute, Mr. Chapman is prescribed glucose tablets to help him raise his blood sugar. However, Defendant BOP fails to ensure that Mr. Chapman is able to renew his prescription when he runs out of glucose tabs. Mr. Chapman's prescription is set to renew every ten days, but he has no way to speed up the renewal process if he runs out of glucose tabs before the

end of the 10-day period. This recurring issue became apparent from the first weeks Mr.

Chapman arrived at USP-Terre Haute, and he attempted to address it with every person he

can think of, including Dr. Wilson, Health Services Administrator (HSA) Rupska,

Pharmacist Jamie Auten, Nurse Clingerman, and Assistant Health Services Administrator

(AHSA) McCoy. Yet, Mr. Chapman still runs out of glucose tabs often.

49. It is particularly dangerous for Mr. Chapman to be without glucose tabs because in order to

derive any benefit from the tabs – i.e., in order for the tabs to raise his blood sugar – he must

take at least five tabs at a time. Even then, Mr. Chapman's elevation in blood glucose is

moderate, at best.

50. Defendant BOP medical staff members also arbitrarily and improperly reduced Mr.

Chapman's ability to check his blood sugar at ADX.

51. According to Defendant BOP policies and procedures and community standards of care, Mr.

Chapman needs to be able to check his blood sugar at critical times of day. At a minimum,

these include when he wakes up, before he eats his meals, before and after he exercises,

before he goes to sleep, and whenever he feels like his blood sugar is too high or too low.

52. At ADX, Defendant BOP medical staff initially provided Mr. Chapman with enough medical

supplies to check his blood sugar five times a day: twice before receiving each insulin dose

and three additional times. This meant that Mr. Chapman would not be able to check his

blood sugar at other critical times of day.

53. In May 2014, BOP medical staff, including Defendants Osagie and Santini, arbitrarily and

improperly reduced the amount of times Mr. Chapman can check his blood sugar to three-

and-a-half times a day. As a result, Mr. Chapman could not check his blood sugar at most critical times of day.

54. Defendant BOP medical staff members, including Defendant Santini, assess the effectiveness of Mr. Chapman's medication and other aspects of his diabetes management during Chronic Care appointments.

55. These Chronic Care appointments are Mr. Chapman's main source of medical attention. At ADX, Mr. Chapman could not access medical staff by walking into the prison clinic because he was in complete lockdown.

56. In the institutions where Defendant BOP incarcerated Mr. Chapman prior to ADX (United States Penitentiary – Big Sandy and USP Lewisburg), the BOP provided Mr. Chapman with quarterly Chronic Care appointments. Furthermore, according to BOP policies and procedures, Mr. Chapman should receive at least quarterly Chronic Care appointments because of his especially severe form of Type 1 diabetes, his lack of blood sugar control, and his diabetic complications.

57. At ADX, Defendant BOP, including Defendant Santini, provided Mr. Chapman with at most two Chronic Care appointments a year. Furthermore, during these appointments, BOP medical staff, including Defendant Santini, did not actually evaluate Mr. Chapman's diabetes management. For example, when Mr. Chapman described the problems he has with blood sugar control, Defendant Santini listened passively and did nothing to address Mr. Chapman's problems, deliberately disregarding the obvious risk to Mr. Chapman's health that results from a lack of blood sugar control.

58. Defendant BOP continues to provide Mr. Chapman insufficient Chronic Care appointments at USP-Terre Haute. While the frequency of Mr. Chapman's Chronic Care appointments has increased, the appointments are arbitrary and meaningless because Defendant BOP medical staff members Dr. Wilson, HSA Rupska, and AHSA McCoy use the appointments as a time to intimidate Mr. Chapman into dropping this lawsuit rather than actually treating his serious medical condition. During these Chronic Care appointments, Defendant BOP medical staff members refuse to answer Mr. Chapman's questions about his diabetes treatment. Instead, they simply tell him that his hemoglobin A1C number is fine, so he is fine. Defendant BOP medical staff members completely ignore and disregard Mr. Chapman's thorough and meticulous logs that show the frequency and severity of his blood sugar fluctuations.

59. In March 2016, Defendant BOP began sending Mr. Chapman to see an outside endocrinologist, Dr. Mohammad Alam. However, Defendant BOP will not provide Dr. Alam access to Mr. Chapman's personal logs where he records his daily blood glucose numbers, and Defendant BOP allows Mr. Chapman to see Dr. Alam only every few months. In the interim, if Mr. Chapman has problems with his diabetes, he does not have access to Dr. Alam. Yet, despite this lack of access, Defendant BOP's medical staff, including Dr. Wilson, refuse to answer Mr. Chapman's questions about his medical care, instead telling him that he needs to raise all issues with Dr. Alam. In addition, during his initial visit with Dr. Alam, Dr. Alam informed Mr. Chapman that he should be given an insulin pump, but Defendant BOP refused to provide Mr. Chapman an insulin pump and Dr. Alam reversed his opinion on whether Mr. Chapman needs an insulin pump.

60. In addition to the infrequent and rote Chronic Care appointments at ADX, Defendant BOP medical staff, including Defendants Osagie, and Camacho, delayed and denied Mr. Chapman adequate medical care through improper and arbitrary insulin administration.

61. The delay and denial of Mr. Chapman's medication caused by Defendants Osagie and Camacho excluded Mr. Chapman from Defendant BOP medical services because of his especially severe form of Type 1 diabetes.

62. The delay and denial of Mr. Chapman's medication caused by Defendants Osagie and Camacho prevented him from utilizing the first key to managing diabetes and substantially harmed him or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

63. In addition, all Defendants denied, and Defendant BOP continues to deny, Mr. Chapman the ability to manage his diabetes through diet, the second key to managing diabetes.

64. Mr. Chapman is substantially limited in his ability to eat, a major life activity, because of his especially severe form of Type 1 diabetes.

65. Unlike most people – both in and out of prison – Mr. Chapman cannot eat a meal for company, tradition, or pleasure. On the contrary, food is medicine for Mr. Chapman. He must always adhere to a strict dietary regimen and meal time schedule because of his Type 1 diabetes.

66. According to Defendant BOP policies and procedures and community standards of care, Mr. Chapman should eat a consistent amount of carbohydrates at each meal and have a means to

identify the amount of carbohydrates in each food item in his meals ("carbohydrate

counting"). The purpose of carbohydrate counting is to allow Mr. Chapman the ability to

plan the proper balance of diet, exercise, and medication.

67. All defendants denied and Defendant BOP continues to deny Mr. Chapman the ability to

count his carbohydrates.

68. At USP-Terre Haute, Defendant BOP staff members refuse to provide Mr. Chapman

carbohydrate information related to his diet – Defendant BOP's Common Fare (religious)

meal plan. Instead, Defendant BOP provided Mr. Chapman with lists of foods with certain

carbohydrate amounts, but these lists do not include any of the foods that Defendant BOP

actually provides Mr. Chapman to eat. In fact, the lists include foods that Defendant BOP

never serves, like pecan pie and beer. Defendant BOP has also provided Mr. Chapman with

the "National Carbohydrate Counting Menu," but that menu does not include items featured

in Defendant BOP's Common Fare meal plan.

69. Defendant BOP's failure to provide Mr. Chapman the carbohydrate content of the food it

actually serves him prevents Mr. Chapman from carbohydrate counting, even though

Defendant BOP's contracted-endocrinologist, Dr. Mohammad Alam, prescribed

carbohydrate counting as part of Mr. Chapman's treatment plan for his Type 1 diabetes.

Therefore, Defendant BOP prevents Mr. Chapman from knowing the carbohydrate content of

his meals, a tool which would allow him to adjust his insulin dose to account for his

carbohydrate consumption.

70. According to Defendant BOP policies and procedures and community standards of care, Mr.

Chapman must eat in accordance with a set meal time schedule. According to community

standards of care, Mr. Chapman should receive his meals within 45 minutes of receiving his insulin.

71. Defendant BOP staff, including Defendants Osagie and Camacho, rarely delivered insulin within 45 minutes of Mr. Chapman's morning or evening meal at ADX. Furthermore, Defendant BOP staff, including Defendants Osagie and Camacho, never delivered insulin with Mr. Chapman's lunch until after Mr. Chapman initiated this lawsuit and filed his first motion for a temporary restraining order.

72. Defendants Osagie and Camacho's refusal to coordinate Mr. Chapman's morning and evening meals and insulin and Defendants Osagie and Camacho's denial of insulin with lunch caused Mr. Chapman substantial harm and put him at substantial risk of serious harm. According to Defendant BOP policies and procedures, the "best" result of uncoordinated meals and insulin delivery is hyperglycemia and the worst result is severe hypoglycemia.

73. At USP-Terre Haute, Mr. Chapman is able to utilize an insulin-only pill line in the morning and evening, which allows him to better coordinate his breakfast and dinner with his insulin administration. However, coordination of his lunchtime meal and insulin still remains a problem because Defendant BOP stopped providing the "insulin-only" pill line at lunch not long after Mr. Chapman's arrival at USP-Terre Haute, despite providing Mr. Chapman admission paperwork that said there would be three "insulin-only" pill lines, one before each meal. This means that in order to receive his insulin injection before lunch, Mr. Chapman must wait in the general pill line, which is open to the entire prison population. Because the wait is so long, sometimes Defendant BOP staff members close the grill, or gate, that would

allow Mr. Chapman to move from pill line to chow hall. When this happens, Mr. Chapman is not able to eat after he receives his insulin injection, putting him at risk of hypoglycemia.

74. At USP-Terre Haute, Defendant BOP refuses to provide Mr. Chapman lunchtime insulin on days he has a family visit. Initially, Defendant BOP also refused to provide Mr. Chapman lunchtime insulin on days he had a legal visit, but Defendant BOP has since corrected this practice and now allows Mr. Chapman to receive lunchtime insulin during legal visits. However, Defendant BOP's continued refusal to provide Mr. Chapman lunchtime insulin during social visits forces him to choose between receiving his insulin and spending time with his family. Social visits are an important part of the rehabilitative programming offered by Defendant BOP. By forcing Mr. Chapman to choose between participating in this programming or receiving his necessary medication, Defendant BOP discriminates against Mr. Chapman on the basis of his disability.

75. At USP-Terre Haute, Defendant BOP also completely fails to coordinate Mr. Chapman's insulin administration and meal delivery during periods of lockdown. For example, Defendant BOP locked down USP-Terre Haute from February 15, 2017 until February 22, 2017. During that time, Defendant BOP consistently brought Mr. Chapman his meals and insulin at least an hour apart and, on one occasion, as much as five hours apart. This pattern of being consistently inconsistent in meal and insulin delivery times repeated during at least two other lockdowns in March and April 2017. On two occasions during the March 2017 lockdown, Defendant BOP did not bring him insulin at all.

76. The following graph plots the constant, life-threatening variation in Mr. Chapman's morning and evening meal times (shaded line) and insulin delivery times (fluctuating line) from

January 2, 2013 to September 23, 2014 while Defendant BOP incarcerated Mr. Chapman at

ADX. All of the data in the graph come from Mr. Chapman's medical records as maintained

by Defendant BOP.



77. Defendants Osagie and Camacho's denial of coordination between morning and evening

meals and insulin and Defendants Osagie and Camacho's denial of insulin with lunch

substantially limited Mr. Chapman's ability to eat and have excluded him from BOP food

services because of his especially severe form of Type 1 diabetes.

78. Defendants Osagie and Camacho's delay and denial of Mr. Chapman's ability to eat have

prevented him from utilizing the second key to managing diabetes. The delay and denial has

substantially harmed Mr. Chapman or put him at substantial risk of serious future harm,

including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness,

cardiovascular disease, neuropathy, cognitive impairment, cataracts, skin problems, bone and joint problems, stroke, heart failure, coma, and imminent death.

79. Furthermore, Defendants denied and continue to deny Mr. Chapman the ability to manage his diabetes through exercise, the third and final key to managing diabetes.

80. According to Defendant BOP policies and procedures and community standards of care, Mr. Chapman must exercise in order to manage his Type 1 diabetes, but he can only do so when his exercise is coordinated with his meals and medication. If this coordination is lacking, exercise causes Mr. Chapman's blood sugar to plummet to a dangerously low level.

81. At ADX, Defendant BOP locked Mr. Chapman in a 75-square-foot cell for an average of 22 to 24 hours a day. In March 2015, Mr. Chapman was moved into the J-unit in ADX's Step-Down Unit.

82. At ADX, Defendant BOP staff allowed Mr. Chapman at most 14 hours of out-of-cell exercise a week. Some weeks Defendant BOP staff provided less exercise because BOP staff arbitrarily canceled recreation time. For example, BOP staff canceled Mr. Chapman's recreation time for a week in 2014 because of Correctional Officers Appreciation Week.

83. At USP-Terre Haute, Defendant BOP prohibits Mr. Chapman from leaving his cell to exercise during lockdowns. At those times, Mr. Chapman must do all of his necessary exercise – a requisite tool to manage his diabetes – in his 80 square foot cell, which he shares with another person. Mr. Chapman's cell is so small that he can reach out and touch his bed with one hand and the wall with his other hand. As a result, his movements and the types of exercises he can do are extremely limited. During the times when the prison is locked down for several days or weeks at time, Mr. Chapman's ability to exercise is severely hindered.

84. Defendants' delay and denial of Mr. Chapman's ability to exercise at ADX excluded him from BOP recreational services because of his especially severe form of Type 1 diabetes.

85. Defendant BOP continues to exclude Mr. Chapman from BOP recreational services by requiring him to choose between outside recreation or receiving his insulin at USP-Terre Haute.

86. At USP-Terre Haute, there are eight recreation moves each day. Prisoners who do not have diabetes have the opportunity to go outside during all eight of those recreation moves. However, three of those recreation moves conflict with the pill line moves such that Mr. Chapman must choose between receiving his insulin or going to outdoor recreation. By forcing Mr. Chapman to choose between participating in this recreational programming or receiving his necessary medication, Defendant BOP discriminates against Mr. Chapman on the basis of his disability.

87. Defendants' delay and denial of Mr. Chapman's ability to exercise have prevented him from utilizing the third key to managing diabetes; therefore, Defendants have denied and continue to deny Mr. Chapman the ability to manage his Type 1 diabetes, and Defendants' delay and denial have substantially harmed Mr. Chapman or put him at substantial risk of serious future harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

    **ii.**    **Defendants' Delay and Denial of Adequate Medical Care for Mr. Chapman's Type 1 Diabetes Has Caused Him Substantial Harm and Put Him at Substantial Risk of Serious Harm.**

88. The delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes caused by Defendants BOP, Osagie, Camacho, and Santini put him at substantial risk of serious harm, including loss of consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, cardiovascular disease, neuropathy, kidney retinopathy, cataracts, cognitive impairment, skin problems, bone and joint problems, coma, and imminent death.

89. The delay and denial of adequate medical care for Mr. Chapman's Type 1 diabetes caused by Defendants BOP, Osagie, Camacho, and Santini caused Mr. Chapman to suffer worsening diabetic neuropathy, almost daily hypoglycemia, and frequent hyperglycemia.

90. According to Defendant BOP policies and procedures and the ADA, diabetic neuropathy is a severe form of nerve damage that worsens when the blood sugar of a person with diabetes is out of control.

91. Mr. Chapman's diabetic neuropathy worsened because Defendants have denied him the ability to control his blood sugar.

92. Defendant Osagie denied Mr. Chapman the ability to control his blood sugar by improperly administering insulin and not refilling medical supplies in a timely manner.

93. Defendant Santini denied Mr. Chapman the ability to control his blood sugar by taking no action whatsoever in response to Mr. Chapman's assertions during Chronic Care appointments that he is unable to control his blood sugar as a result of the inadequate medical care he is receiving.

94. Defendant Camacho denied Mr. Chapman the ability to control his blood sugar by improperly administering insulin, not refilling medical supplies in a timely manner, refusing

to refill medical supplies, and refusing to respond to Mr. Chapman's requests for help when he is hypoglycemic.

95. Defendant BOP denied Mr. Chapman the ability to control his blood sugar by failing to supervise Defendants Osagie, Santini, and Camacho to ensure that they provided Mr. Chapman with medical care in accordance with the community standards of care.

96. Defendant BOP continues to deny Mr. Chapman the ability to control his blood sugar by failing to ensure the proper administration of insulin (both type and dose), failing to refill medical supplies in a timely manner, failing to respond to Mr. Chapman's expressed concerns about his lack of glycemic control, failing to ensure coordination of all of Mr. Chapman's meals and insulin, failing to provide Mr. Chapman adequate opportunities to exercise at all times in order to maintain glycemic control, refusing to provide Mr. Chapman an insulin pump or continuous glucose monitoring, and failing to supervise its staff to ensure it provides medical care to Mr. Chapman in accordance with community standards of care for diabetes.

97. This inadequate care caused Mr. Chapman to suffer tremors in his extremities and considerable pain. This inadequate care also put Mr. Chapman at substantial risk of decreased blood flow, ulcers, chronic infections, and death.

98. Additionally, Defendants BOP, Osagie, Camacho, and Santini's prevention of Mr. Chapman from controlling his blood sugar caused and continues to cause him to suffer almost daily hypoglycemia and frequent hyperglycemia.

99. The following graph plots the 238 times from February 14, 2011 to March 15, 2014, that Mr. Chapman's life was in danger because of hypoglycemia. All of the data in the graph come

from Defendant BOP medical records. Mr. Chapman, however, often experiences

hypoglycemia of which Defendant BOP medical staff is unaware and thus does not record.



100.    Since his transfer to USP-Terre Haute, Mr. Chapman continues to suffer frequent

episodes of hypoglycemia. For example, from November 1, 2016 until April 12, 2017, Mr.

Chapman's blood sugar readings indicated a state of hypoglycemia 166 times.

101.    When Mr. Chapman is hypoglycemic, he sweats profusely.

102.    When Mr. Chapman is hypoglycemic, he feels weak.

103.    When Mr. Chapman is hypoglycemic, his limbs are hard to move.

104.    When Mr. Chapman is hypoglycemic, he feels like his chest is going to explode.

105.    When Mr. Chapman is hypoglycemic, he has a gag reflex even when drinking water.

106.    When Mr. Chapman is hypoglycemic, he gets severe headaches.

107.    When Mr. Chapman is hypoglycemic, he feels foggy and has difficulty reading.

108.    When Mr. Chapman is hypoglycemic, he begins to shake.

109.    When Mr. Chapman is hypoglycemic, he can suffer neuroglycopenia, a medical condition
in which a person suffering hypoglycemia experiences an altered mental state because of the
lack of blood sugar in the brain. At ADX, Mr. Chapman suffered neuroglycopenia over a
hundred times. Mr. Chapman continues to suffer neuroglycopenia at USP-Terre Haute.

110.    When Mr. Chapman is hypoglycemic he can lose consciousness and be completely
unaware for hours at a time. At ADX, Mr. Chapman lost consciousness approximately a
dozen times. Mr. Chapman has lost consciousness at USP-Terre Haute on a handful of
occasions.

111.    The frequency with which Mr. Chapman suffers hypoglycemia makes him less and less
likely to be able to perceive when he is hypoglycemic, and, therefore, more and more
dependent on Defendant BOP medical staff responding to his requests for medical assistance.

112.    Despite Mr. Chapman's reliance on Defendant BOP medical staff and Defendant BOP
policies and procedures requiring that a BOP physician should be called when a person with
diabetes is suffering hypoglycemia, a BOP physician is rarely called when Mr. Chapman
suffers a hypoglycemic episode.

113.    At USP-Terre Haute, Mr. Chapman has repeatedly experienced hypoglycemic episodes in
front of Defendant BOP medical staff at pill line. BOP medical staff rarely take action to
normalize Mr. Chapman's blood sugar and never call a physician to attend to Mr. Chapman.

114.    Furthermore, Mr. Chapman relied on Defendant BOP medical staff at ADX, including
Defendants Osagie, Camacho, and Santini, because he is at high risk for suffering
hypoglycemia while sleeping. For this same reason, Mr. Chapman relies on Defendant BOP

medical staff at USP-Terre Haute to protect him from experiencing hypoglycemia while sleeping.

115. As a result of this high risk for hypoglycemia, Mr. Chapman is substantially limited in his ability to sleep, a major life activity, because of his especially severe form of Type 1 diabetes.

116. In addition to hypoglycemia, the delay and denial of adequate medical care caused by Defendants Osagie, Camacho, and Santini caused Mr. Chapman to frequently suffer hyperglycemia, a very painful medical condition that can lead to a life-threatening medical condition called diabetic ketoacidosis.

117. The following graph plots the 546 times from January 19, 2011 to March 10, 2014, that Mr. Chapman's health was jeopardized because of hyperglycemia. All of the data in the graph come from Defendant BOP medical records. Mr. Chapman, however, often experiences hypoglycemia of which BOP medical staff is unaware and thus does not record.



118.    Since his transfer to USP-Terre Haute, Mr. Chapman continues to suffer frequent

episodes of hyperglycemia. For example, from November 1, 2016 until April 12, 2017, Mr.

Chapman suffered hyperglycemia 371 times.

119.    When Mr. Chapman is hyperglycemic, he feels severe body pain.

120.    When Mr. Chapman is hyperglycemic, he feels chest pain.

121.    When Mr. Chapman is hyperglycemic, he feels weak.

122.    When Mr. Chapman is hyperglycemic, he becomes dehydrated from frequent urination

(often every fifteen minutes).

123.    When Mr. Chapman is hyperglycemic, he feels like his blood is on fire.

124.    When Mr. Chapman suffered hyperglycemia, hypoglycemia, or another kind of medical

emergency at ADX, he pressed the emergency call button in his cell in order to summon

Defendant BOP staff to his cell.

125.    Often, Defendant BOP staff did not respond after Mr. Chapman pressed his emergency

call button. Defendant BOP staff members, including Defendant Camacho, told Mr.

Chapman that they do not respond because Mr. Chapman was, in their opinion "fine," after

such medical emergencies in the past.

126.    When Defendant BOP staff members did respond, they did so after more than 45 minutes

elapsed. On more than one occasion, Defendant BOP staff took eight hours to respond. For

example, in 2013, Mr. Chapman nearly lost consciousness from hypoglycemia after no

Defendant BOP staff member ever responded when he pressed his emergency call button.

127.    When Defendant BOP staff members did respond and come to Mr. Chapman's cell, they

determined if it was necessary to summon a BOP medical staff member. Defendant BOP

correctional staff members often unsuccessfully summoned a Defendant BOP medical staff member. For example, on multiple occasions, Defendant BOP staff called Defendant Osagie to Mr. Chapman's cell because of Mr. Chapman's dangerous medical condition, and Defendant Osagie never responded.

128.    If Defendant BOP medical staff members, including Defendants Osagie and Camacho, did arrive, they came empty-handed. For example, when Mr. Chapman was hypoglycemic at ADX, Defendant BOP medical staff members, including Defendants Osagie and Camacho, rely on and use Mr. Chapman's limited, personal supply of glucose gel tubes and food he bought at the commissary to increase his blood sugar.

129.    In addition to the problems Mr. Chapman faced when he was able to press his emergency call button, Mr. Chapman often faced problems actually pressing the button.

130.    When Mr. Chapman is hyperglycemic, he often cannot press his emergency call button because he is in such extreme pain that he cannot control his extremities in order to press his button.

131.     When Mr. Chapman is hypoglycemic, his mental state can be so altered that he cannot realize that he should press his emergency call button. Moreover, because Mr. Chapman was in solitary confinement at ADX and BOP staff members rarely walked by his cell, Mr. Chapman had to rely on a hope that prisoners in nearby cells would hear his manifestations of his altered mental state (such as spontaneous singing) or hear him fall and hit his concrete furniture or the concrete floor and then press their emergency call buttons for him.

132.    Mr. Chapman continues to experience problems receiving adequate medical attention in emergency situations at USP-Terre Haute. For example, on February 27, 2016, Mr.

Chapman's blood sugar dropped so low that his glucometer could not read it; the glucometer simply said "LOW", meaning that Mr. Chapman's blood sugar dipped below 20 mg/dl. Luckily, Mr. Chapman felt himself losing consciousness and went to his cell door to inform his neighbor what was happening. Mr. Chapman then blacked out. Mr. Chapman's neighbor contacted a Defendant BOP correctional officer, who contacted medical. No Defendant BOP medical staff member ever came. Even after Mr. Chapman sent written cop-outs to medical about this incident, no Defendant BOP medical staff member ever responded to him.

133.    The delay and denial of medical care for Mr. Chapman's serious medical need caused by Defendants Osagie, Camacho, and Santini caused him substantial harm and put him at substantial risk of serious harm. Defendant BOP's continued delay and denial of medical care for Mr. Chapman's serious medical need continues to place him at substantial risk of serious harm.

**B. Defendants Knew and Recklessly Disregarded that Their Inadequate Medical Care for Mr. Chapman's Type 1 Diabetes Caused and Continues to Cause Him Substantial Harm and Put Him at Substantial Risk of Serious Harm.**

108.    Since his incarceration, Defendant BOP has known that Mr. Chapman has an especially severe form of Type 1 diabetes that requires daily, specialized medical care.

109.    At ADX, Defendants Osagie, Camacho, and Santini knew that Mr. Chapman has an especially severe form of Type 1 diabetes that requires daily, specialized medical care.

110.    Mr. Chapman has discussed with Defendant BOP staff members at USP-Terre Haute and ADX, including Defendants Osagie, Camacho, and Santini, the fact that his form of Type 1 diabetes requires specialized care.

111.    Defendant BOP has classified Mr. Chapman as a prisoner who requires more medical attention than the typical prisoner.

112.    Before ADX, Defendant BOP incarcerated Mr. Chapman at FMC-Springfield, the BOP's medical prison. Mr. Chapman's placement at FMC-Springfield occurred after Defendant BOP medical staff at USP-Lewisburg placed Mr. Chapman in grave danger by removing him from insulin entirely. Defendant BOP kept Mr. Chapman in FMC-Springfield for over a year in order to stabilize Mr. Chapman's diabetes management.

113.    During a 2011 Chronic Care appointment, a Defendant BOP physician wrote that "[Mr. Chapman] might prove to be a very brittle diabetic challenge . . . . We will have to monitor [him] very closely to prevent transfer back to [Springfield]."

114.    Defendant BOP policies and procedures and community standards of care state that blood sugar control is the goal of diabetes management. Defendants Osagie, Camacho, and Santini either knew of the risk posed to Mr. Chapman by his lack of glycemic control through these policies and procedures and community standards of care or should have known because the substantial risk to Mr. Chapman was obvious.

   **i.    Defendants Knew and Recklessly Disregarded the Substantial Harm and Substantial Risk of Serious Harm to Mr. Chapman By Denying Him the Ability to Manage His Type 1 Diabetes Through Proper Medication, Diet, and Exercise.**

115.    Defendant BOP policies and procedures and community standards of care state that persons with diabetes can only control their blood sugar through proper medication, diet, and exercise. At ADX, Defendants either knew that Mr. Chapman needed to coordinate these three areas in order to obtain glycemic control through these policies and procedures and community standards of care or should have known of the need because the substantial risk

31

to Mr. Chapman was obvious. At USP-Terre Haute, Defendant BOP continues to know that

Mr. Chapman must coordinate his diet, medication, and exercise in order to obtain glycemic

control.

116.    At ADX, Defendants Osagie, Camacho, and Santini either knew that they were not

providing Mr. Chapman with the proper medication, the first key to diabetes management, or

should have known because the substantial risk posed to Mr. Chapman by his frequent and

severe fluctuations in blood sugar was obvious.

117.    According to Defendant BOP policies and procedures and community standards of care,

persons with Type 1 diabetes need insulin to live. At ADX, Defendants Osagie, Camacho,

and Santini either knew of these policies and procedures and community standards of care or

should have known because the substantial risk to Mr. Chapman of not receiving insulin is

obvious.

118.    At ADX, Defendants Osagie, Camacho, and Santini knew that Defendant BOP medical

staff prescribed Mr. Chapman a specific dosage of a specific form of insulin to administer to

him in the morning and at night.

119.    At USP-Terre Haute, Defendant BOP medical staff know that Mr. Chapman is prescribed

a specific dosage and type of insulin based on his sliding scale prescription, and Defendant

BOP medical staff know that Mr. Chapman must be administered the appropriate dosage and

type before each meal.

120.    On multiple occasions, Mr. Chapman told Defendant BOP medical staff members at

ADX, including Defendants Osagie and Camacho, that they administered the wrong dosage

or form of insulin. At USP-Terre Haute, Mr. Chapman, to the extent he can see the insulin

being administered to him, continues to tell Defendant BOP medical staff members when they are about to administer the wrong type or dosage of insulin.

121.     At ADX, Defendant BOP medical staff, including Defendants Osagie and Camacho, either knew that administering insulin diluted with air reduces the dosage of insulin Mr. Chapman receives or should have known because the substantial risk of administering a dosage of insulin with air pockets is obvious. At USP-Terre Haute, Defendant BOP either knows or should know that administering insulin with air pockets necessarily reduces the intended dose.

122.     On multiple occasions, Mr. Chapman told Defendant BOP staff members at ADX, including Defendant Osagie, that they are administering insulin diluted with air. Mr. Chapman, to the extent he can see the insulin being administered, continues to tell Defendant BOP staff members at USP-Terre Haute when they attempt to administer an insulin dose with air pockets.

123.     Defendant BOP policies and procedures mandate that insulin should be administered within 15 minutes of drawing it because it can spoil and become ineffective if not administered promptly. At ADX, Defendants Osagie and Camacho either knew of these policies and procedures or should have known that insulin needs to be administered shortly after it is drawn because the substantial risk of doing otherwise is obvious.

124.     In 2014, Defendant BOP denied Mr. Chapman's Administrative Remedy #784108, in which he requested that BOP medical staff draw insulin into the syringe within 15 minutes of administering it.

125.   In 2012 and 2013, Mr. Chapman's counsel sent letters to the former warden of ADX, David Berkebile, and requested that Defendant BOP medical staff draw insulin into the syringe within 15 minutes of administering it. In those letters, Mr. Chapman's counsel informed Warden Berkebile and Defendant BOP that BOP medical staff never does this. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that insulin should be administered within 15 minutes of drawing it into the syringe.

126.   On multiple occasions, Mr. Chapman told BOP medical staff members at ADX, including Defendants Osagie and Camacho, that they were not administering insulin within a 15-minute window of it being drawn.

127.   Community standards of care mandate that Mr. Chapman have the proper medical supplies with which to manage his Type 1 diabetes. Defendants BOP, Osagie, Camacho, and Santini either knew of these community standards of care or should have known because the substantial risk of not having proper medical supplies is obvious.

128.   Defendant BOP policies and procedures mandate that prisoners receive their medical supplies in a timely fashion. At ADX, Defendants Osagie, Camacho, and Santini either knew of these policies and procedures or should have known because the substantial risk of not receiving medical supplies is obvious. At USP-Terre Haute, Defendant BOP continues to know that Mr. Chapman must receive his medical supplies, particularly his lancets and glucose tablets, in a timely fashion. At minimum, Defendant BOP should know that the risk of Mr. Chapman being unable to recover from an episode of severe hypoglycemia without emergency medical tools like glucose tablets is obvious.

129.    On multiple occasions, to no avail, Mr. Chapman asked Defendants Osagie and Camacho

to replenish his medical supplies in a timely fashion before he ran out of his critical supplies.

130.    On multiple occasions, Mr. Chapman asked Defendant Camacho to replenish his medical

supplies, and Defendant Camacho refused because, in Defendant Camacho's opinion, it is

not his "job" as a Mid-Level Practitioner to replenish life-saving medical supplies.

131.    At ADX, Defendants knew that Mr. Chapman had been prescribed a limited supply of

glucose gel tubes each month. At USP-Terre Haute, Defendant BOP knows that Mr.

Chapman may run out of glucose tablets before the prescription automatically refills, yet

Defendant BOP has taken no steps to address this issue to ensure that Mr. Chapman never

runs out of glucose tablets.

132.    At ADX, Defendants Osagie, Camacho, and Santini knew that the only form of sugar that

BOP staff allowed Mr. Chapman to bring with him during recreation was his glucose gel

tubes.

133.    Defendant BOP policies and procedures mandate that persons with diabetes be able to

check their blood sugar as needed. At ADX, Defendants Osagie, Camacho, and Santini either

knew of these policies and procedures or should have known of the risk posed to Mr.

Chapman of not being able to test his blood sugar as needed because the risk is obvious.

134.    Community standards of care mandate that a person with diabetes be able to check his

blood sugar at least six times a day. At ADX, Defendants Osagie, Camacho,  and Santini

either knew of these community standards of care or should have known  the risk to a

prisoner with diabetes of not being able to check his blood sugar because such a risk is

obvious.

135.    At ADX, Defendants Osagie, Camacho, and Santini knew that Defendant BOP staff

members used Mr. Chapman's limited, personal supply of lancets and tests strips and

interfered with his ability to self-medicate when he is hypoglycemic.

136.    At ADX, Defendants Osagie, Camacho, and Santini knew that Defendant BOP medical

staff changed Mr. Chapman's prescription from being able to check his blood sugar five

times a day to being able to check his blood sugar three-and-a-half times a day.

137.    In 2014, Defendant BOP denied Mr. Chapman's Administrative Remedy #784105, in

which he requested to be able to check his blood sugar six times a day.

138.    In a letter to ADX Warden John Oliver in 2014 ("2014 Warden Letter"), Mr. Chapman's

counsel requested that BOP medical staff allow Mr. Chapman to check his blood sugar six

times a day, pursuant to community standards of care that mandate that Mr. Chapman be

allowed to check his blood sugar at least six times a day.

139.    In 2014, Mr. Chapman wrote letters to Defendant Osagie, Defendant Camacho, and

Defendant BOP's pharmacy at ADX, in which he requested that he be allowed to check his

blood sugar more often.

140.    At ADX, Defendants Osagie, Camacho, and Santini either knew Mr. Chapman needed

more Chronic Care appointments so that BOP medical staff could assess the effectiveness of

Mr. Chapman's medication and other aspects of his diabetes management or should have

known of the need for more appointments because the risk of inadequate medical care for a

person with diabetes who lacks glycemic control is obvious. At USP-Terre Haute, Defendant

BOP knows that Mr. Chapman needs effective and responsive Chronic Care appointments

that will assist him in obtaining glycemic control.

36

141.    Defendant BOP policies and procedures recommend that Mr. Chapman receive at least

quarterly Chronic Care appointments because of his especially severe form of Type 1

diabetes, his lack of blood sugar control, and his diabetic complications. At ADX,

Defendants Osagie, Camacho, and Santini either knew of these policies and procedures or

should have known that Mr. Chapman needed additional Chronic Care appointments because

the substantial risk posed by Mr. Chapman's severe Type 1 diabetes is obvious.

142.    In 2014, Defendant BOP denied Mr. Chapman's Administrative Remedy #782449, in

which he requested quarterly Chronic Care appointments.

143.    In the 2014 Warden Letter, Mr. Chapman's counsel requested that Defendant Oliver

provide Mr. Chapman with quarterly Chronic Care appointments because of his especially

severe form of Type 1 diabetes. Moreover, Mr. Chapman's counsel stated that community

standards of care mandate that Mr. Chapman receive quarterly Chronic Care appointments.

144.    At ADX, Defendants Osagie, Camacho, and Santini either knew that they delayed and

denied Mr. Chapman the ability to manage his diabetes through proper medication, the first

key of diabetes management, or should have known because the substantial risk of improper

insulin administration is obvious. Despite Defendants Osagie, Camacho, and Santini's

knowledge, they have recklessly disregarded the substantial risk to Mr. Chapman and acted

unreasonably. Defendant BOP continues to disregard the risk to Mr. Chapman by failing to

ensure that Mr. Chapman is properly administered the correct dose and form of insulin at

USP-Terre Haute.

145.   At ADX, Defendants Osagie, Camacho, and Santini either knew that they were not providing Mr. Chapman with the proper diet, the second key for diabetes management, or should have known because the substantial risk to Mr. Chapman was obvious.

146.   Defendant BOP policies and procedures and community standards of care recommend that persons with diabetes be allowed to count carbohydrates at every meal. At ADX, Defendants, including Defendants Osagie and Santini, either knew of these policies and procedures and community standards of care or should have known because the substantial risk posed by a person with Type 1 diabetes consuming food without knowing the carbohydrate content is obvious. Defendant BOP, through its policies, knows that persons with Type 1 diabetes like Mr. Chapman need to know the carbohydrate content of the food they consume, yet Defendant BOP continues to refuse to provide Mr. Chapman the carbohydrate content of the food it serves him through the Common Fare meal plan.

147.   In 2012, Defendant BOP denied Mr. Chapman's Administrative Remedy #629975, in which he requested to be allowed to count his carbohydrates.

148.   In the 2014 Warden Letter, Mr. Chapman's counsel requested that BOP staff provide Mr. Chapman with consistent amount of carbohydrates. Mr. Chapman's counsel stated that community standards of care recommend that a person with diabetes be provided a consistent amount of carbohydrates.

149.   Defendant BOP policies and procedures and community standards of care mandate that a prisoner with diabetes receive his meals at consistent times that coordinate with insulin delivery times. At ADX, Defendants either knew of these policies and procedures and

community standards of care or should have known of the substantial risk posed by administering insulin without food or vice versa because such a risk is obvious.

150.    According to community standards of care, persons with diabetes should receive their meals within 45 minutes of receiving insulin. At ADX, Defendants, including Defendants Osagie, Camacho, and Santini, either knew the community standards of care or should have known because the substantial risk posed by administering insulin without food or vice versa is obvious. Defendant BOP knows that Mr. Chapman needs to receive his lunch within 45 minutes of receiving insulin, yet Defendant BOP cancelled the insulin-only pill line at lunch and has failed to address the issue of Mr. Chapman getting caught behind the grill and therefore prevented from eating his lunch after receiving insulin.

151.    Defendant BOP policies and procedures state that the "best" result of uncoordinated meals and insulin delivery is hyperglycemia and the worst result is severe hypoglycemia. At ADX, Defendants, including Defendants Osagie, Camacho, and Santini, knew of these policies and procedures.

152.    In 2014, Defendant BOP denied Mr. Chapman's Administrative Remedy #781510, in which he requested that BOP staff deliver his insulin at consistent times and within 45 minutes of his meals.

153.    In the 2014 Warden Letter, Mr. Chapman's counsel requested that Defendant BOP staff provide Mr. Chapman with meals at consistent times. Moreover, Mr. Chapman's counsel stated that community standards of care mandate that a person with diabetes consume meals and insulin within a 45-minute window.

154.   At ADX, Defendants, including Defendants Osagie, Camacho, and Santini, knew that they delayed and denied Mr. Chapman the ability to manage his diabetes through proper diet, the second key of diabetes management. Despite Defendants' knowledge of this, they recklessly disregarded the substantial risk to Mr. Chapman and acted unreasonably.

155.   At ADX, Defendants, including Defendant Santini, either knew that they were not providing Mr. Chapman with the proper amount of exercise, the third key for diabetes management, or Defendants, including Defendant Santini, should have known because the substantial risk of not providing sufficient exercise to a person suffering from diabetes like Mr. Chapman is obvious.

156.   Defendant BOP policies and procedures and community standards of care state that persons with diabetes must exercise the proper amount in order to manage their diabetes. At ADX, Defendants, including Defendants Osagie, Camacho, and Santini, either knew of these policies and procedures and community standards of care or should have known that persons with diabetes need to exercise because the substantial risk of not exercising is obvious.

157.   At ADX, Defendants, including Defendants Osagie, Camacho, and Santini, knew that BOP staff provided Mr. Chapman with, at most, ten hours of out-of-cell exercise a week and that the rest of the time Mr. Chapman was in lockdown in a 70-square-foot cell. Defendant BOP continues to know that Mr. Chapman needs to exercise and is unable to effectively do so during lockdowns at USP-Terre Haute because Defendant BOP knows that Mr. Chapman cannot leave his cell during those time periods.

158.    In 2011, Defendant BOP denied Mr. Chapman's Administrative Remedy #630355, in

which he requested BOP staff allow him to exercise more in order to manage his Type 1

diabetes.

159.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant BOP of the

importance of exercise for the management of Mr. Chapman's Type 1 diabetes.

160.    Since Mr. Chapman's arrival, Defendants, including Defendants Osagie, Camacho, and

Santini, either knew or should have known that they delayed and denied Mr. Chapman the

ability to manage his diabetes through proper exercise, the third key of diabetes management.

Despite Defendants' knowledge of this, they recklessly disregarded the substantial risk to Mr.

Chapman and acted unreasonably.

161.    Despite Defendants BOP, Osagie, Camacho, and Santini's knowledge of these risks to

Mr. Chapman's health caused by their inadequate provision of medical care – or despite the

obviousness of those risks – Defendants BOP, Osagie, Camacho, and Santini took and

Defendant BOP continues to take no action to assist Mr. Chapman in his ability to control his

blood sugar by properly administering his insulin, providing him with sufficient medical

supplies to check his blood sugar, or coordinating his meals with his insulin and his exercise.

      **ii.    Defendants Knew and Recklessly Disregarded that Mr. Chapman Suffered
        and Continues to Suffer Diabetic Neuropathy, Hypoglycemia, and
        Hyperglycemia, and Defendants Knew and Recklessly Disregarded that Mr.
        Chapman Faced and Faces a Substantial Risk of Loss of Consciousness,
        Diabetic Ketoacidosis, Kidney Failure, Blindness, Heart Failure, Coma, and
        Imminent Death.**

162.    Defendant BOP's policies and procedures and the ADA state that diabetic neuropathy is

treated by blood sugar control. At ADX, Defendants either knew of these policies and

procedures and the ADA's recommendation or should have known that a lack of blood sugar control could lead to diabetic neuropathy because such a substantial risk is obvious.

163.    In a 2011 clinical encounter with Mr. Chapman, a BOP physician wrote in Mr. Chapman's medical record that Mr. Chapman developed a form of diabetic neuropathy as a complication of his Type 1 diabetes.

164.    At ADX, Defendants BOP, Osagie, Camacho, and Santini knew that Mr. Chapman suffered hypoglycemia and remained at substantial risk of suffering hypoglycemia. Defendant BOP continues to know that Mr. Chapman suffers hypoglycemia and remains at substantial risk of suffering hypoglycemia.

165.    Defendant BOP policies and procedures mandate that a BOP physician be called when a person with diabetes is suffering hypoglycemia. At ADX, Defendants, including Defendants Osagie, Camacho, and Santini, knew of these policies and procedures. Defendant BOP knows that Mr. Chapman continues to suffer episodes of hypoglycemia in front of medical staff at USP-Terre Haute and that medical staff do not call for a doctor during these episodes.

166.    At ADX, Defendants, including Defendants Osagie and Santini, knew Mr. Chapman suffered hypoglycemia 238 times from February 14, 2011 to March 15, 2014 because these episodes were documented in his medical records. At USP-Terre Haute, Defendant BOP knew Mr. Chapman suffered hypoglycemia at least 20 times because Defendant BOP medical staff recorded those hypoglycemic episodes in his electronic medical record.

167.    In a 2011 Chronic Care appointment with Mr. Chapman, a Defendant BOP physician wrote in Mr. Chapman's medical record that "[Mr. Chapman] reports severe hypoglycemic levels to 'to 0' in the past."

168.    In a 2013 Clinical Encounter with Mr. Chapman, Defendant Osagie wrote in Mr. Chapman's medical record that "[Mr. Chapman is] a known diabetic who periodically experiences severe hypoglycemic episode[s]."

169.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant BOP that Mr. Chapman is at an increased risk of suffering hypoglycemia because of his especially severe form of Type 1 diabetes.

170.    In 2014, Mr. Chapman sent Defendant Osagie a letter from Mohammed Shakir, M.D., an endocrinologist who treated Mr. Chapman before his incarceration (the "2014 Dr. Shakir Letter"). In the letter, Dr. Shakir warned that Mr. Chapman is at high risk of hypoglycemia and that Mr. Chapman may suffer hypoglycemia while sleeping.

171.    In 2014, Mr. Chapman informed Defendant Santini that he shakes and suffers frequent defecation (itself an indication of low blood sugar). Defendant Santini did not do anything to address Mr. Chapman's symptoms, which are ongoing.

172.    At ADX, Defendants BOP, Osagie, Camacho, and Santini knew that Mr. Chapman has suffered hyperglycemia and remains at substantial risk of suffering hyperglycemia. Defendant BOP continues to know that Mr. Chapman suffers hyperglycemia and remains at substantial risk of suffering hyperglycemia.

173.    At ADX, Defendants, including Defendants Osagie and Santini, knew that Mr. Chapman suffered hyperglycemia 546 times from January 19, 2011 to March 10, 2014, because these episodes were documented in his medical records. At USP-Terre Haute, Defendant BOP knew Mr. Chapman suffered hyperglycemia at least 107 times because Defendant BOP medical staff recorded those hyperglycemic episodes in his electronic medical record.

174.    In the 2014 Shakir Letter, Dr. Shakir warned Defendant Osagie that Mr. Chapman is at high risk of suffering hyperglycemia.

175.    On multiple occasions, Defendant Camacho told Mr. Chapman that Defendant Camacho will not come to Mr. Chapman's assistance when he is hyperglycemic because, in Defendant Camacho's opinion, Mr. Chapman will not die immediately from hyperglycemia.

176.    At ADX, Defendants Osagie, Camacho, and Santini either knew that Mr. Chapman is at substantial risk of developing diabetic ketoacidosis when his hyperglycemia is left untreated or should have known because the substantial risk of a person with Type 1 diabetes with frequent episodes of hyperglycemia developing diabetic ketoacidosis is obvious.

177.    In the 2014 Warden Letter, Mr. Chapman's counsel informed Defendant BOP that failure to treat hyperglycemia can cause diabetic ketoacidosis.

178.    In the 2014 Shakir Letter, Dr. Shakir warned Defendant Osagie that Mr. Chapman is at high risk of diabetic ketoacidosis.

179.    At ADX, Defendants BOP Osagie, Camacho, and Santini either knew that they have caused Mr. Chapman to suffer and put him at substantial risk of worsening diabetic neuropathy, almost daily hypoglycemia, and frequent hyperglycemia or should have known because these substantial risks to Mr. Chapman were obvious. Despite Defendants BOP, Osagie, Camacho, and Santini's knowledge of this, they have recklessly disregarded the substantial risk to Mr. Chapman and acted unreasonably by refusing to take any actions to prevent Mr. Chapman from suffering these symptoms, including properly administering his insulin, providing him with adequate medical supplies to test his blood sugar, and coordinating his meals with his insulin.

180.   Therefore, all of the Defendants have acted, and Defendant BOP continues to act, with deliberate indifference to Mr. Chapman's serious medical need.

## IV.   Claims for Relief

## FIRST CLAIM FOR RELIEF

### (Eighth Amendment Violation – Inadequate Medical Care)

### (Against All Defendants)

181.   Plaintiff hereby incorporates all prior paragraphs of this Second Amended Complaint as if fully set herein.

182.   At all times relevant to the allegations in this Second Amended Complaint, Defendants acted or failed to act under color of federal law.

183.   At all times relevant to the allegations in this Second Amended Complaint, all of the Defendants were acting pursuant to federal custom, policy, or practice in their acts and omissions pertaining to Mr. Chapman's inadequate medical care for his Type 1 diabetes.

184.   Under the Eighth Amendment to the Constitution, prison officials must provide adequate medical care to prisoners, who rely entirely on the prison system for their medical needs.

185.   Mr. Chapman, while housed at ADX, was constitutionally entitled to receive adequate medical care for his serious medical need, Type 1 diabetes. The right to receive adequate medical care is a clearly established right, and at no time during Mr. Chapman's housing at ADX would a reasonable prison official have thought it lawful to deny Mr. Chapman his constitutional right to adequate medical care.

186.   Mr. Chapman is constitutionally entitiled to receive adequate medical care for his serious medical need, Type 1 diabetes, wherever Defendant BOP chooses to house him. This means

that Mr. Chapman is constitutionally entitled to receive adequate medical care for his Type 1 diabetes at USP-Terre Haute and in whatever other institution Defendant BOP may choose to confine him in the future.

187.    Acting with deliberate indifference to Mr. Chapman's constitutional right to receive adequate medical care, all of the Defendants delayed and denied and Defendant BOP continues to delay and deny Mr. Chapman medical care in accordance with the community standards of care and BOP policies and procedures for treating Type 1 diabetes.

188.    The delay and denial of inadequate medical care to Mr. Chapman caused by all of the Defendants caused and continues to cause him to suffer substantial harm that serves no penological purpose - namely, considerable pain and suffering, hyperglycemia, hypoglycemia, worsening neuropathy, and loss of consciousness.

189.    The delay and denial of inadequate medical care to Mr. Chapman caused by all of the Defendants caused and continue to cause him to be subject to substantial risk of serious harm - namely, considerable pain and suffering, hyperglycemia, hypoglycemia, consciousness, diabetic ketoacidosis, kidney failure, blindness, stroke, heart failure, coma, and imminent death.

190.    All of the Defendants knew or should have known that their inadequate medical care caused and causes Mr. Chapman to be subject to substantial harm and substantial risk of serious harm.

191.    Defendant BOP promulgated, created, implemented, or possessed responsibility for the policies and procedures concerning Mr. Chapman's medical care that caused Mr. Chapman substantial harm and substantial risk of serious harm. Defendant BOP acts with a mindset of

deliberate indifference because it knows or should know that the policies and procedures at ADX caused Mr. Chapman to be subject to substantial harm and substantial risk of serious harm.

192.    All of the Defendants' acts and omissions are the proximate cause of Mr. Chapman's deprivation of rights under the Eighth Amendment.

193.    The acts or omissions of all of the Defendants were conducted within the scope of their official duties and employment.

## SECOND CLAIM FOR RELIEF

### (Sect. 504 Rehabilitation Act – Disability Discrimination)

### (Against all Defendants)

194.    Plaintiff hereby incorporates all prior paragraphs of this Complaint as if fully set herein.

195.    The purpose of the Rehabilitation Act is to ensure that no "qualified individual with a disability . . . shall, solely by reason of [] disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency. . . ." 29 U.S.C. § 794(a).

196.    Defendant BOP is an executive agency within the meaning of 29 U.S.C. § 794(a).

197.    Mr. Chapman is an individual with a physical disability within the meaning of 29 U.S.C. § 705(9)(B) because his diabetes constitutes a physical impairment that substantially limits him in several major life activities, including, but not limited to, exercising, eating, sleeping, and caring for himself. These limitations on his life activities have had a profound effect on Mr. Chapman's life as described above. Mr. Chapman also has a record of an impairment

47

that substantially limits the above-listed major life activities, and also is regarded as having such an impairment.

198.    As a prisoner in the custody of Defendant BOP, Mr. Chapman is qualified for the programs, activities, aids, benefits, and services offered by Defendant BOP.

199.    Mr. Chapman - with or without reasonable modifications to rules, policies, or practices - met and continues to meet the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendant BOP. Thus, Mr. Chapman is a "qualified handicapped person" within the meaning of 29 U.S.C. § 794.

200.    The U.S. Department of Justice has issued regulations implementing the Rehabilitation Act to clarify the responsibilities of Department of Justice agencies, such as the BOP, and all other programs or activities conducted by an Executive Agency of the United States government. 28 C.F.R. Part 39.

201.    The Department of Justice's regulations clarify that the Rehabilitation Act forbids any agency from providing any service, program, or activity in a manner that may (i) deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit or service; (ii) afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others; (iii) provide a qualified handicapped person with an aid, benefit or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others; and (vi) otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving the aid, benefit, or service. 28 C.F.R. § 39.130(b).

202.    Defendant BOP discriminates against Mr. Chapman on the basis of his disability in

violation of 29 U.S.C. § 794 and its implementation of BOP policies and procedures.

203.    Such discrimination includes, but is not limited to, the exclusion of Mr. Chapman on the

basis of his disability from services and programs afforded to prisoners. These programs and

services include, but are not limited to, medical services, food services, recreational services,

and visiting services. Defendant BOP also fails to make reasonable accommodations and

modifications to policies, practices, and procedures that are necessary for Mr. Chapman to be

able to participate in Defendants' services, programs, and activities, including but not limited

to medical services, food services, recreation services, and visiting services.

204.    Defendant BOP's failure to make reasonable accommodations and reasonable

modifications to rules, policies and practices continues to deny Mr. Chapman, on the basis of

his disability, the same access to Defendant BOP's services, benefits, activities, programs,

and privileges as is afforded to individuals without disabilities.

205.    The failure to provide comparable access to services, benefits, activities, programs, and

privileges are policies, regular practices, and/or customs of Defendant BOP. These failures

are ongoing.

206.    As a proximate result of Defendant BOP's violations of the Rehabilitation Act, Mr.

Chapman has suffered, and continues to suffer, discrimination, unequal treatment, exclusion

(including exclusion from Defendant BOP's services, benefits, activities, programs, and

privileges), emotional pain and suffering, anxiety, trauma, unnecessary loss of rights and

privileges, and serious injury to his health, including the injuries specified herein.

207.    Defendant BOP's discrimination is intentional and represents deliberate indifference to

the strong likelihood that pursuit of the actions and policies at issue in this Second Amended

Complaint would likely result in a violation of federally protected rights.

208.    Defendant BOPs failure to comply with the Rehabilitation Act has resulted and will

continue to result in harm to Mr. Chapman as he will be in the custody of Defendant BOP

and will continue to seek to use the services, benefits, activities, programs, and privileges

provided by Defendant BOP and to which he is entitled. This harm will continue unless and

until Defendant BOP is ordered by this Court to modify its policies, practices, and procedures

as demanded by the Rehabilitation Act.

### V.    Prayer for Relief

209.    Plaintiff requests that this Court enter judgment for Plaintiff and against each of the

Defendants, and award Plaintiff all relief allowed by law, including but not limited to the

following:

a.  a declaration that Mr. Chapman has been deprived by Defendants of his right to be free

from cruel and unusual punishment in violation of the Eighth Amendment to the

Constitution;

b.  a declaration that Defendant BOP has discriminated against Mr. Chapman on the basis of

his Type 1 diabetes in violation of Section 504 of the Rehabilitation Act;

c.  an injunction be entered against Defendant BOP requiring medical care for Mr.

Chapman's Type 1 diabetes be provided in accordance with community standards of care

wherever Defendant BOP chooses to house him;

d.  compensatory damages against Defendants Santini, Osagie, and Camacho in their individual capacities, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering, on all claims allowed by law in an amount to be determined at trial;

e.  punitive damages on all claims allowed by law and in an amount to be determined at trial;

f.  nominal damages on all claims allowed by law and in an amount to be determined at trial;

g.  attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

h.  the Court retain jurisdiction of this matter until Defendants demonstrate that they have fully complied with the orders of this Court, and that there is reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

i.  any further relief that this Court deems just and proper.

**PLAINTIFF REQUESTS A TRIAL BY JURY.**

Dated: May 15, 2017

Respectfully submitted,

STUDENT LAW OFFICE

/s/ Laura Rovner
Laura Rovner
Nicole B. Godfrey
Danielle C. Jefferis
University of Denver Sturm College of Law
2255 E. Evans Ave., Ste. 335
Denver, CO 80208
Phone: (303) 871-6441
Email: lrovner@law.du.edu

**CERTIFICATE OF SERVICE**

       I hereby certify that on May 15, 2017, I filed the foregoing Second Amended Complaint using the Court's CM/ECF system, which will send notice of the filing via electronic mail to the following:

       Zeyen.Wu@usdoj.gov
       Amy. Padden@usdoj.gov
       Marisela.Sandoval@usdoj.gov
       Joshua.Hansen-King@usdoj.gov
       david.moskowitz@usdoj.gov

       *Counsel for Defendants*


                              *s/Laura Rovner*
                              Laura Rovner